[Crim. No. 15215. In Bank. July 7, 1971.]

In re GARY W., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
GARY W., Defendant and Appellant.

COUNSEL

Richard S. Buckley, Public Defender, Laurance S. Smith, Kathryn J. McDonald and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and Blanche C. Bersch, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

WRIGHT, C. J.—In this case we are called upon to determine whether the procedures by which the California Youth Authority is empowered to extend its control over a ward beyond his normal release date are constitutional.

We have concluded that confinement pursuant to Welfare and Institutions Code sections 1800-1803[1] does not violate the Eighth Amendment's proscription of cruel and unusual punishment, but that persons who are subjected to proceedings initiated thereunder are entitled, upon request, to a jury trial.

Gary W., who was a minor ward of the California Youth Authority at the time this proceeding commenced, appeals from an order of the juvenile court directing his continued detention by the Youth Authority for treatment. He contends that the statutory scheme of sections 1800-1803 and the judicial procedures by which those sections are implemented permit imprisonment for status and deny due process and equal protection in violation of the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 6, 11, 13 and 21, of the California Constitution. He complains in particular of the denial of the right to trial by jury. In addition, appellant contends that the order appealed from is not supported by substantial evidence and that he was erroneously denied the right to pretrial discovery and to subpoena out-of-county witnesses.

The contentions of the parties and our analysis are better understood if, before reciting the factual background of the case, we summarize the scope and impact of the statutory scheme under review. Sections 1800-1803 apply only to wards of the California Youth Authority, i.e., to minors committed to the Youth Authority by the juvenile court pursuant to the

---

[1]Unless otherwise indicated, all references are to the Welfare and Institutions Code.

authority of sections 730, 731, and 777, and to young adults committed by the superior court pursuant to sections 1730-1731.5. Under the procedures here reviewed the California Youth Authority may petition the court which initially committed the ward to the Youth Authority for an order directing the Youth Authority to retain control over the ward beyond the date upon which his release would otherwise be mandatory. The court may order the ward detained for treatment, for a period of up to two years if he was committed by the juvenile court or five years if he was committed after conviction of a criminal offense, if the ward is found to be physically dangerous to the public because of mental or physical deficiency, disorder, or abnormality. The proceedings apply only to the detention of adults, including persons who have committed no criminal offense. The theoretical maximum period of detention is life as successive petitions may be filed at biennial intervals. Finally, the Youth Authority may place the ward in a facility of the Department of Corrections if, because of age or other factors, he is deemed unsuitable for treatment in a facility of the Youth Authority.

On November 8, 1967, the juvenile court committed Gary to the Youth Authority after finding that he had molested a child and was thus a person described by section 602.[2] He was then 19 years old. His discharge was mandatory, under section 1769,[3] at the end of two years or on his twenty-first birthday, whichever was later,[4] unless an order for further detention had then been made pursuant to section 1800.[5] Gary became 21 on August

---

[2]Section 602: "Any person under the age of 21 years who violates any law of this State or of the United States or any ordinance of any city or county of this State defining crime or who, after having been found by the juvenile court to be a person described by Section 601, fails to obey any lawful order of the juvenile court, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

[3]Section 1769: "Every person committed to the authority by a juvenile court shall be discharged upon the expiration of a two-year period of control or when the person reaches his 21st birthday, whichever occurs later, unless an order for further detention has been made by the committing court pursuant to Article 6 (commencing with Section 1800)."

[4]Although the original commitment order recited that Gary should be confined "until the expiration of a two year period of control, or until said ward is 21 years of age, to wit: until August 10, 1969 . . .," we find no significance in the omission of the qualification "whichever occurs later." The juvenile court was without power to order commitment for any period other than the statutory term. Thus, any ambiguity in the order must be resolved in favor of a reading of the order that is consistent with the statute and the court's obvious intent to impose the statutory term as reflected in the oral pronouncement of commitment for the time prescribed by section 1769.

[5]Section 1800: "Whenever the Youth Authority Board determines that the discharge of a person from the control of the Youth Authority at the time required by Section 1769, 1770, 1770.1, or 1771, as applicable, would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality,

10, 1969. The Youth Authority filed a petition under section 1800 on August 11, 1969, alleging that Gary was "a person who would be physically dangerous to the public due to his mental or physical deficiency, disorder, or abnormality . . . ," and requesting an extension of control over him for a period of two years, to and including his twenty-third birthday. After a hearing at which both the Youth Authority and Gary presented evidence on the issue of his "dangerousness," the juvenile court found the allegations of the petition to be true, and, on October 27, 1969, ordered that Gary remain subject to the control of the California Youth Authority through his twenty-third birthday. He appeals from that order.

I

*Punishment for Status*

■ Preliminarily we dispose of appellant's contention that he is being punished for his alleged status of "dangerousness" in violation of the Eighth Amendment to the United States Constitution and article I, section 6, of the California Constitution (*Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417]).

Respondent concedes that if Gary were to be imprisoned as a criminal under these procedures his detention would be unconstitutional under *Robinson* as cruel and unusual punishment. (*In re De La O* (1963) 59 Cal.2d 128, 136 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705].) Implicit in this concession is an admission that continued confinement pursuant to section 1800 is predicated on status. As in *De La O*, therefore, "The issue is whether the statutory scheme here challenged (a) 'imprisons' petitioner 'as a criminal,' or (b) constitutes 'compulsory treatment' of petitioner as a sick person requiring 'periods of involuntary confinement.' " (59 Cal.2d at p. 136.) The question is easily resolved, for the Legislature has been at pains to assure that confinement pursuant to sections 1800-1803 shall be only for the purpose of treatment. Thus, we need not decide whether confinement under these sections, with the potential for confinement in a state prison, would be constitutionally permissible solely for the purpose of protecting society.

Section 1800 provides in pertinent part: "Whenever the Youth Author-

the board, through its chairman, shall make application to the committing court for an order directing that the person remain subject to the control of the authority beyond such time. The application shall be filed at least 90 days before the time of discharge otherwise required. The application shall be accompanied by a written statement of the facts upon which the board bases its opinion that discharge from control of the Youth Authority at the time stated would be physically dangerous to the public, but no such application shall be dismissed nor shall an order be denied merely because of technical defects in the application."

ity Board determines that the discharge of a person from the control of the Youth Authority at the time required by Section 1769 . . . would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality, the board . . . shall make application to the committing court for an order directing that the person remain subject to the control of the authority beyond such time." Potential danger to the public is thus made the criterion upon which jurisdiction to order continued control rests. But the Legislature has also specified that if the court finds that discharge of the ward would be physically dangerous, "the court shall order the Youth Authority to continue the treatment of such person." (§ 1801.) Thus, as to any person committed to its control pursuant to sections 1800-1803, the Youth Authority is under an affirmative duty to provide treatment for the underlying cause of the ward's dangerousness. If the cause is not a physical or mental condition or the condition is not amenable to treatment, the Youth Authority may not extend its control over the ward pursuant to sections 1800-1803.[6]

In view of the demonstrably civil purpose of sections 1800-1803, and in the absence of any evidence that persons committed thereunder are incarcerated in penal institutions among the general prison population, or are customarily detained without treatment, we conclude that the statutory scheme of sections 1800-1803 and the confinement of Youth Authority wards thereunder does not constitute cruel and unusual punishment within the meaning of *Robinson* v. *California, supra,* 370 U.S. 660.

Appellant also contends, however, that he was not given treatment while confined under the original commitment. Indeed, he elicited testimony from respondent's expert, Dr. Alfred Owre, the chief medical officer of the Atascadero State Hospital, where he had been confined for observation, that "he had been kept on ice in the Youth Authority and he hasn't received any significant psychiatric treatment there, either." The evidence of lack of treatment was sufficiently disturbing to the juvenile court judge that in ordering Gary's continued detention he declared his intention to communicate to the Youth Authority his conclusion that it had been derelict in its responsibility to Gary.

The failure of the Youth Authority to provide treatment to a particular ward committed to it under statutory provisions other than those here

---

[6]It should be emphasized that we do not suggest that a person who is physically dangerous to society must be set free. The Youth Authority has available to it a variety of alternatives to continued control under sections 1800-1803. See, e.g., section 1780 (commitment of dangerous ward to state prison if period of control not equal to maximum term for offense of which he was convicted); section 5000 et seq. (detention and certification for involuntary treatment of imminently dangerous persons); and section 6300 (commitment of mentally disordered sex offenders).

under review is not a basis for invalidation of sections 1800-1803. As we have noted, the Youth Authority is under an affirmative obligation to provide treatment for the ward's mental or physical abnormality when he is committed pursuant to those sections. Detention of such wards without treatment is unauthorized by statute. Accordingly, any person confined pursuant to a section 1800 commitment, but who is not receiving treatment may seek his release through appropriate habeas corpus procedures. (Pen. Code, § 1473; cf. *People* v. *Succop* (1966) 65 Cal.2d 483, 488-489 [55 Cal.Rptr. 397, 421 P.2d 405]; *In re De La O, supra,* 59 Cal.2d 128, 156.)

## II

### *Due Process and Equal Protection*

Appellant next contends that due process and equal protection preclude his commitment to a period of involuntary confinement unless he is afforded a right to trial by jury. He argues that the procedure leading to detention under section 1800, applying as it does only to persons under jurisdiction of the Youth Authority, irrationally and unreasonably discriminates between youthful persons dangerous because of physical or mental abnormality and other persons similarly dangerous but not within the jurisdiction of the Youth Authority. He contends that because no rational distinction can be drawn between dangerous Youth Authority wards and other dangerous persons, he is entitled to all of the rights accorded such other persons in statutory commitment proceedings such as those applicable to mentally disordered sex offenders (§ 6318), to imminently dangerous persons (§§ 5302-5303), and to narcotics addicts (§§ 3050, 3051 and 3108).

Appellant recognizes that neither the Fourteenth Amendment of the Constitution of the United States nor the California Constitution (art. I, §§ 11, 21; art. IV, § 16) precludes classification by the Legislature or requires uniform operation of the law with respect to persons who are different. The state may not, however, arbitrarily accord privileges to or impose disabilities upon one class unless some rational distinction between those included in and those excluded from the class exists. "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645]. See also *F. S. Royster Guano Co.* v. *Virginia* (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 40 S.Ct. 560]; *Developments in the Law—Equal Protection* (1969)

82 Harv.L.Rev. 1065, 1076; Tussman and tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal.L.Rev. 341, 346.)

 The commitment and detention for treatment of a physically dangerous Youth Authority ward does not of itself deny equal protection. As appellant acknowledges, the Legislature has enacted a unified framework of laws providing for the involuntary commitment of persons who present a danger to society. It is not unreasonable that the Legislature should devise several means by which to detect and isolate persons who may present a danger to society.[7] It is particularly appropriate that a prior contact with the system of criminal justice should be an event which may give rise to such an inquiry inasmuch as the antisocial act which brought the defendant before the court may be symptomatic of a condition which instills a propensity to commit such acts. The legislative decision to provide for the continuation of treatment of Youth Authority wards who have reached their majority under Youth Authority control, rather than transferring their treatment to the Department of Mental Hygiene or another agency of the state is neither unreasonable nor arbitrary. (Cf. *In re De La O, supra,* 59 Cal.2d 128, 138-139; *In re Cavanaugh* (1965) 234 Cal.App.2d 316, 321-322 [44 Cal.Rptr. 422].)

However, although the procedures leading to the commitment of various classes of people for treatment or to protect society from them need not be identical in all respects, none may deny to one such class fundamental rights or privileges accorded to another unless a rational basis for the distinction exists. Thus we must evaluate the procedures adopted to implement sections 1800-1803 in light of other statutory provisions governing involuntary commitment. (Cf. *Baxstrom v. Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760].)

Chief among these is the Lanterman-Petris-Short Act and related legislation (Stats. 1967, ch. 1667; §§ 5000-5401, 6250-6825) the provisions of which encompass the involuntary commitment of persons who because of mental illness are imminently dangerous, inebriates, mentally disordered sex offenders, gravely disabled persons, persons who are suicidal, and the mentally retarded. In addition we must consider the procedures by which persons may be committed for treatment of actual or potential narcotics addiction pursuant to section 3050 et seq.

---

[7]For example, proceedings under the Lanterman-Petris-Short Act with respect to mentally ill or chronically alcoholic persons may be initiated by the district attorney, a peace officer, a member of the attending staff of an evaluation facility, or by an individual. (§§ 5114, 5150, 5201.) In the case of suspected narcotics addicts or mentally disordered sex offenders, the courts in which such persons have been convicted of a crime may order commencement of involuntary commitment proceedings. (§§ 3050, 3051, 6302.)

Appellant contends that persons in these categories are generally accorded greater protection against unjust or unnecessary confinement than are Youth Authority wards subject to section 1800 and that the majority are entitled to a jury determination that they are within the class subject to commitment. Our examination of the relevant statutes confirms this assertion. In every case except that of mentally retarded persons the person subject to commitment is entitled to a jury trial before he may be detained for reasons other than brief observation or emergency care. No person may be involuntarily committed as an imminently dangerous mentally ill person for longer than 17 days of treatment (§§ 5150, 5250: 72 hours initial observation plus 14 days of intensive treatment) without a hearing at which he is entitled upon demand to a unanimous jury determination that the facts necessary to support the commitment have been proven. (§ 5303.) A person found to be a mentally disordered sex offender and ordered committed pursuant to section 6316 may demand a jury trial on the question of whether he is a mentally disordered sex offender (§ 6318) and is entitled to be discharged unless he is found to be so by three-fourths of the jury. (§ 6321.) No person held for treatment as an inebriate may be detained for longer than 72 hours of treatment unless he could also have been detained as an imminently dangerous or gravely disabled person, in which case further detention must be pursuant to the provisions governing those classes of persons. (§ 5230.) An alleged gravely disabled person is entitled to a jury trial on the issue of whether he is gravely disabled. (§ 5350, subd. (d).)

Similarly, the alleged narcotics addict, whether or not he has been convicted of a crime, is entitled upon demand to a jury trial and a three-fourths verdict on the question of his addiction before he may be involuntarily committed. (§§ 3050, 3051, 3108.) Apart from those statutory provisions dealing with the mentally retarded and Youth Authority wards, there is no authority for the involuntary commitment of adults without a jury trial if requested.

Respondent does not challenge this analysis, but asserts that the instant proceedings are a continuation of juvenile proceedings, as to which no right to jury trial exists, and that they are not criminal proceedings. Neither factor is dispositive. As has been shown, the commitment proceeding here applies only to adults. It is in no way a juvenile proceeding, nor is it an extension of a prior juvenile court proceeding. The question before the court in juvenile proceedings under sections 601 and 602 is whether the juvenile is a person described by those sections, i.e., is he a minor who refuses to obey reasonable orders "of his parents, guardian, custodian or school authorities, or who is beyond the control of such person, or [a] person who is a habitual truant . . . or who . . . is in danger of lead-

ing an idle, dissolute, lewd, or immoral life" (§ 601) or has he violated any law or, if found to be a person described in section 601, has he failed to obey a lawful order of the juvenile court. (§ 602.) The question before the court in a section 1800 proceeding is whether an adult is physically dangerous to the public because of physical or mental abnormality. We perceive no logical basis upon which to characterize a section 1800 proceeding as a juvenile proceeding or an extension thereof. Were it not for the statutory command that the section 1800 petition be filed in the "committing court," which in many instances was the juvenile court, it would be entirely appropriate for all such proceedings to be held in the superior court.

Denial of the right to a jury trial to a person subject to commitment pursuant to section 1800 cannot, therefore, be predicated upon any rational distinction which may be drawn between juveniles and other members of the public.

The necessity for a rational distinction among persons whom the law treats differently is of particular importance in the area of involuntary commitment. ■ Although normally any rational connection between distinctions drawn by a statute and the legitimate purpose thereof will suffice to uphold the statute's constitutionality (*Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 578), closer scrutiny is afforded a statute which affects fundamental interests or employs a suspect classification. (*In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999]; *Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d at pp. 578-579.) In such cases the state bears the burden of establishing both that the state has a compelling interest which justifies the law and that the distinction is necessary to further that purpose. (*In re Antazo, supra,* 3 Cal.3d 100, 111; *Castro* v. *State of California* (1970) 2 Cal.3d 223, 234-236 [85 Cal.Rptr. 20, 466 P.2d 244].)

A variety of interests have been held to be so "fundamental" as to impose this burden on the state. Voting (*Castro* v. *State of California, supra,* 2 Cal.3d 223), procreation (*Skinner* v. *Oklahoma* (1942) 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110]), interstate travel (*Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]), and education (*Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180]) have all been characterized as fundamental for this purpose. The right to a jury trial in an action which may lead to the involuntary confinement of the defendant, even if such confinement is for the purpose of treatment, is no less fundamental. Its fundamental nature is reflected by the absolute right to jury trial accorded by the Sixth and Seventh Amendments to the United States Constitution

and by article I, section 7 of the California Constitution in all criminal trials and in those civil actions in which such a right was available at common law. Its fundamental nature was further emphasized by the United States Supreme Court in *Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444], where the court held that due process requires that the right to jury trial be extended to defendants in state criminal prosecutions of a serious nature. Although *Duncan* involved a criminal prosecution, the court found the right to jury trial was required by the dictate of the Fourteenth Amendment that no state "deprive any person of life, liberty or property, without due process of law." The court recognized that "A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government" and that "the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to · entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." (391 U.S. at pp. 155-156.) To the person who is threatened with involuntary confinement, these considerations are equally important whether the threat of confinement originates in a civil action or a criminal prosecution.

In extending the right to trial by jury to other classes of persons subject to civil commitment proceedings, the California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction. We conclude that in the absence of a compelling state purpose for the distinction between the class of persons subject to commitment pursuant to section 1800 and to other classes of persons subject to involuntary confinement, the right to jury trial is a requirement of both due process of law and equal protection of the law.

Our conclusion finds support in the decision of the United States Supreme Court in *Baxstrom* v. *Herold, supra,* 383 U.S. 107. There a New York state prisoner who had been transferred to a hospital for mentally ill prisoners was the subject of a petition for civil commitment shortly before the expiration of his term. In accord with a commitment procedure applicable only to prisoners, a judicial hearing was held at which the court found that the prisoner might be in need of care in an institution for the mentally ill. The state's Department of Mental Hygiene refused to accept him, however, upon an ex parte determination that he was not suitable for care in a civil hospital. He was therefore retained in the hospital operated by the New York Department of Correction. The Supreme Court held: "[P]etitioner was denied equal protection of the laws by the statutory

procedure under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York. Petitioner was further denied equal protection of the laws by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he is dangerously mentally ill such as that afforded to all so committed except those . . . nearing the expiration of a penal sentence." (383 U.S. at p. 110 [15 L.Ed.2d at p. 623].) After noting that the state had made jury review of the sanity issue available to all others subject to civil commitment, the court concluded: "It follows that the State, having made this substantial review proceeding generally available on this issue, may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some. . . . [T]here is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other commitments." (*Id*. at pp. 111-112 [15 L.Ed.2d at pp. 623-624].)

Respondent argues that the California system is distinguishable because of its complexity and the fact that commitment proceedings differ among the classes subject to them. Respondent also suggests that the classification is reasonable because mentally retarded persons also are not entitled to a jury trial. It is apparent that these contentions must fail. The complexity of the various commitment statutes does not obscure the effect of denial of the right to jury trial. We consider here a fundamental right, not minor procedural differences among the various commitment procedures. The state does not meet its burden of demonstrating a compelling interest in denying the right to jury trial to Youth Authority wards by claiming that other distinctions exist among these procedures or by pointing out that alleged mentally retarded persons are similarly discriminated against. The state having made jury trial on the issue of status a prerequisite to commitment "generally available . . . may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some." (*Baxstrom* v. *Herold, supra*, 383 U.S. 107, 111 [15 L.Ed.2d 620, 623].)

Appellant is entitled to a new hearing on the question of whether he is, because of mental or physical deficiency, disorder, or abnormality, physically dangerous to the public. We deem the commitment of Youth Authority wards under section 1800 to be most closely analogous to the civil commitment procedures for suspected mentally disordered sex offenders and narcotics addicts, each of which classes are entitled to a jury trial and a three-fourths verdict. Appellant is entitled to a jury trial in like manner as is made available to those classes.

## III

### Discovery and Subpoena Rights

In view of our conclusion that the case must be returned to the juvenile court for a new hearing, it is not necessary to consider appellant's contention that the evidence was insufficient to support the court's finding that he was subject to commitment under sections 1800-1803. We deem it advisable, however, for the guidance of the court on rehearing, to comment on the extent of discovery and subpoena rights available to a defendant in a section 1800 proceeding.

The statute is silent as to the Youth Authority ward's right to discovery in a section 1800 commitment proceeding. The issue has not arisen in the decided cases involving either Youth Authority wards or other persons subject to commitment. We have, however, recently considered the discovery rights available in juvenile proceedings. In *Joe Z.* v. *Superior Court* (1970) 3 Cal.3d 797 [91 Cal.Rptr. 594, 478 P.2d 26], we held that despite traditional references to juvenile proceedings as "civil" or "essentially civil" in nature, the juvenile court "should have the same degree of discretion as a court in an ordinary criminal case to permit, upon a proper showing, discovery between the parties." (3 Cal.3d at p. 801. See also, *In re Dennis M.* (1969) 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296].) Our determination that the civil discovery statutes were inapplicable to juvenile proceedings was based in part on the quasi-criminal nature of such proceedings "involving . . . the possibility of a substantial loss of personal freedom." We also noted, however, that a "need for expeditious and informal adjudications . . . belies the wisdom or necessity of any indiscriminate application of civil discovery procedures." (3 Cal.3d at p. 801.)

The same considerations are present in other commitment proceedings— the possibility of a substantial loss of personal freedom and the need for expeditious adjudication. Thus, although section 1800 proceedings are not juvenile proceedings, and are not criminal, the same discovery rights should be available to adults subject to commitment as are extended to juveniles and to defendants in criminal prosecutions. In adult commitment proceedings, however, the court also has discretion to authorize, upon a showing of relevance and necessity, any of the discovery tools available in a civil action.

Commitment proceedings are "special proceedings of a civil nature." (*People* v. *Succop, supra,* 65 Cal.2d 483, 486 [mentally disordered sex offenders]; *In re De La O, supra,* 59 Cal.2d 128, 156 [narcotics addicts].) The Legislature has provided that the right to civil discovery shall be

accorded in special proceedings in situations where "it is necessary to do so." (Code Civ. Proc., § 2035.) Thus the court is vested with wide discretion to determine whether the complexity of the issues is such that discovery is necessary to the fact finding process or to the expedition of the hearing. We see no necessity to accord full discovery rights afforded in civil actions to all defendants in commitment proceedings. In such proceedings a single issue is to be resolved, i.e., is the defendant a person described by the statute authorizing his commitment. The narrow issue and the need for expeditious adjudication suggest that it is not unreasonable to require a showing of relevance and necessity as a prerequisite to a discovery order.

It is also reasonable to require that the same showing be made a prerequisite to issuance of an out-of-county subpoena in a section 1800 proceeding. Section 1801 provides that the court "shall afford . . . an opportunity to appear in court with the aid of counsel and of process to compel attendance of witnesses and production of evidence." The requirement that a showing of relevance and necessity be made is found in the statutes governing issuance of subpoenas in mentally disordered sex offender proceedings. (§ 6313.) In proceedings for the commitment of imminently dangerous mentally ill persons a similar requirement exists. (§ 5303; Cal. Const., art. I, § 13.) In such proceedings the defendant has the same right to compel the attendance of witnesses as does a defendant in a criminal proceeding. As to out-of-county witnesses in criminal and juvenile proceedings, the Penal Code provides: "No person is obligated to attend . . . unless the distance be less than 150 miles from his place of residence to the place of trial, or unless the judge . . . upon an affidavit . . . of the defendant, or his counsel . . . stating that he believes the evidence of the witness is material, and his attendance at the examination, trial, or hearing is material and necessary, shall endorse on the subpoena an order for the attendance of the witness." (Pen. Code, § 1330.) The court may properly quash subpoenas directed to local witnesses, as to whom the defendant need make no such showing (Pen. Code, § 1326) if the defendant fails to show that the person could offer relevant testimony. (*In re Finn* (1960) 54 Cal.2d 807, 813 [8 Cal.Rptr. 741, 356 P.2d 685].) It follows that where a showing of relevance and necessity is prerequisite to issuance of the subpoena the court may refuse to endorse the subpoena if it deems the showing to be inadequate.

■ Appellant contends that without knowledge of all reports and records made during his Youth Authority confinement, it was not possible to controvert the allegations of the petition that he was dangerous. He complains that without access to such records he could not ascertain the reason the Youth Authority Board thought he was dangerous.

In an effort to discover the basis for the petition, appellant sought by motion to discover the identity, professional status, and mailing addresses of all persons who examined or diagnosed him, together with written notes, memoranda, and reports prepared by such persons, and, in particular, to discover the content of four reports which were prepared at the Atascadero State Hospital during a 90-day period of observation that preceded the filing of the petition. In addition, he sought to subpoena the chairman of the Youth Authority, to discover the names of the Youth Authority Board members present at the meeting at which it was decided to petition for his continued detention, the number of board members constituting a quorum, and all transcripts, minutes, notes, and other records of the meeting. Both motions were denied.

The petition itself was accompanied by a statement of the facts upon which the board based its opinion that discharge of appellant would be physically dangerous to the public. The petition described generally his contacts with the courts prior to his incarceration, the facts surrounding the present commitment, and briefly outlined the history of his confinement. The allegation that Gary met the standard for continued detention under section 1800 was couched in conclusionary language, but several evaluative reports prepared by staff members of the Youth Authority and of Atascadero State Hospital were attached to the petition.

It is apparent that appellant's discovery requests were far too broad. The court could properly assume that the Youth Authority Board members who voted to petition for continued control of appellant had no personal knowledge of appellant and that their decision was based on the files of the Youth Authority and on the recommendations of various professional personnel who came in contact with him during his commitment to the Youth Authority. Furthermore, the basis of their decision to petition for continued control over Gary is essentially irrelevant to the issue to be decided at the hearing on the petition. It is not why the Board decided to petition, but what evidence the Youth Authority intends to introduce in support of its petition, that is relevant to preparing a defense to the charge. Inasmuch as the question of whether a defendant is physically dangerous because of physical or mental abnormality can be anticipated to be a medical, psychiatric, or psychological judgment, discovery of matters going beyond the basis of the anticipated expert testimony is unnecessary.

The court properly resolved appellant's discovery requests by issuing a subpoena for Dr. Owre, the physician who bore primary responsibility for evaluation of appellant at Atascadero, and who became the primary witness on behalf of the Youth Authority. Dr. Owre brought with him

to the hearing the hospital's file which the court ordered copied for the record. In addition, the court appointed a physician to examine appellant on behalf of the defense, who was given access to the reports of Dr. Owre, including reports of the tests administered at Atascadero. He also reviewed charts from both Atascadero and the Youth Authority. Finally, the court offered to subpoena other witnesses who might have relevant evidence as revealed by Dr. Owre's testimony, and stated that if Dr. Owre appeared to be shielding the identity of any such witness Dr. Owre's testimony would be stricken.

Appellant does not contend that he sought to compel the attendance of any such persons after Dr. Owre's testimony was received. In the absence of any such request and of any showing of prejudice as revealed by an examination of Dr. Owre's testimony, it cannot be said that the trial court abused its discretion in refusing to issue the additional subpoena and to permit the requested discovery.

The order appealed from is vacated and the matter is remanded to the juvenile court for proceedings not inconsistent with this opinion.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.