**William Denton JONES, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–78–604.**

Court of Criminal Appeals of Oklahoma.

March 3, 1983.

Stephen Jones, James Craig Dodd, Enid, for appellant.

Jan Eric Cartwright, Atty. Gen., Mary Bryce Leader, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, William Denton Jones, hereinafter referred to as the defendant, was convicted of Murder in the First Degree in the District Court of Garfield County, in Case No. CRF–78–487. The jury sentenced him to death after hearing evidence of aggravating and mitigating circumstances. In accordance with 21 O.S.1981, § 701.13, this Court has reviewed both the appropriateness of the sentence of death and the errors of law raised on appeal.

## I

### THE SUFFICIENCY OF THE EVIDENCE PRESENTED AT THE TRIAL

█ In his first assignment of error the defendant challenges the sufficiency of the evidence presented at the trial. The standard of review when this issue is raised is whether or not the State presented a prima facie case. *Hunt v. State,* 601 P.2d 464 (Okl.Cr.1979). In evaluating the sufficiency of the evidence, this Court views the evidence in the light most favorable to the State. *Renfro v. State,* 607 P.2d 703 (Okl. Cr.1980). The jury was responsible for resolving conflicts in the evidence, and it resolved them in the State's favor.

█ The evidence presented at the trial was primarily circumstantial, but it was very strong. Jones was at the victim's place of employment when the victim was last seen alive, at about 11:00 a.m. on April 28, 1978. Although he was supposed to relieve a co-worker at a gas station at noon, Jones had not appeared by 12:15, at which time the worker left for lunch; when the defendant did arrive at work after lunch, he had changed his work boots for dress shoes. According to the State's chemist, soil samples taken from the defendant's clothes and from the pickup truck, which was driven solely by the defendant on the morning of the 28th, were consistent with soil samples taken where the body was found, and were dissimilar to the soil around Jones' home or workplaces. Also, a strand of hair found in Jones' pickup was microscopically analyzed and was found to be similar to the victim's hair. Further, a pubic hair found in the victim's vagina was similar to the defendant's hair and unlike either the victim's, her boyfriends' or her employer's hair. The State also introduced a fiber of cloth which was found under the victim's fingernail, and which a State's chemist testified was like the material in the defendant's shirt. A doctor who had studied artificial limbs testified that marks in the mud where the victim's body was found appeared to be marks that would be left by someone wearing an artificial leg, which the defendant had. Additionally, there was testimony that Jones frequently supported himself on his knuckles when he wasn't wearing his prosthesis, and that there were other marks in the mud like those of knuckle impressions. Finally, the defendant made an incriminating statement to a jailmate, saying he had not meant to kill the woman.

The defendant's argument divides the evidence into three categories. First he claims that the testimony of the people involved in his and the victim's day-to-day lives, when properly construed, not only failed to show beyond a reasonable doubt that he was guilty, but in fact established conclusively that he could not have committed the crime. The defendant then argues the evidence in detail, dwelling on inconsistencies and emphasizing interpretations favorable to him.

Second, the defendant urges that the testimony of Theodore King, that the defendant had stated that he did not mean to kill the woman, should not have been admitted. Jones asserts that King's extensive criminal record and his admission that he made his living as a con artist reduced his credibility to a point that his testimony was unbelievable. King's criminal record was made known to the jury and was heavily argued by defense counsel during his closing argument.

Third, Jones challenges the reliability of the scientific tests. He presents technical discussions of the formation and composition of soil and hair, seeking to establish that the comparison tests made by the O.S.B.I. chemist were so simplistic as to be of no evidentiary value. He also alleges that the chemist's test of the cloth fiber found under the victim's fingernail destroyed it, depriving him of the opportunity of having independent tests made; however, this allegation is contradicted by the record.

None of the defendant's arguments are appropriate appellate arguments; he simply argues the weight and credibility of the evidence, which are questions of fact for the trier of fact to resolve. *Hunt v. State,* supra. This assignment of error is without merit.

## II

### SUFFICIENCY OF THE EVIDENCE PRESENTED AT THE PRELIMINARY EXAMINATION

█ The defendant next challenges the sufficiency of the evidence presented at the preliminary examination; his demurrer at that hearing and his motion to quash were both denied. The defendant maintains that under the language of our statutes, 22 O.S. 1981, §§ 262 and 264, "sufficient cause" means a prima facie case must be established. We do not agree. As we stated in *Tabor v. State,* 582 P.2d 1323 (Okl.Cr.1978):

The State is not required at preliminary hearing to present evidence which would be sufficient to convict at trial. *State v. Edmondson,* 536 P.2d 386 (Okl.Cr.1975).

It is well established that a preliminary hearing is not a trial to determine the guilt of the accused, but only the two issues: Was a crime committed, and is there reasonable cause to believe the defendant committed said crime. *Roberts v. State,* 561 P.2d 511 (Okl.Cr.1977). We find from our review of the transcript that testimony taken at the preliminary hearing presented sufficient evidence by the State from which the examining magistrate could find the public offense alleged in the information had been committed, and there was sufficient cause to believe the defendant had committed the offense. *Turner v. State,* 549 P.2d 1346 (Okl.Cr.1976). And where there is competent evidence in the record the reviewing court will not interfere with the determination of the finder of fact.

This assignment of error is without merit.

## III

### THE STANDARDS OF PROOF FOR INDICTMENT AND INFORMATION

█ The defendant further complains of the preliminary examination in that he believes the State discriminated against him by not seeking a grand jury indictment. He claims that his prosecution by information denied him his constitutional right to equal protection of the law. The defendant's argument may be summarized as follows. Under 22 O.S.1981, §§ 262 and 264, the State's burden of proof at a preliminary examination is "that any public offense has been committed, and that there is sufficient cause to believe the defendant guilty thereof, ..." 22 O.S.1981, § 264. This is usually referred to as a showing of probable cause, and as discussed earlier, the showing does not have to be enough evidence to support a conviction. On the other hand, under 22 O.S.1981, § 336, a grand jury may return an indictment "when all of the evidence before them ... would, if unexplained or uncontradicted, warrant a conviction by the trial jury." In other words, a prima facie case. The defendant argues that these two findings, by the magistrate and by the grand jury, occupy correlative

positions in their respective avenues of procedure and that it is improper to have two separate and distinct burdens of proof. He argues that the action of the district attorney in deciding to prosecute some defendants by information and some by indictment creates two classes of people who are treated differently: The State is put to a harder test to obtain a grand jury indictment than to get someone bound over for trial by a magistrate.[1] Since the defendant was prosecuted by information and the State "only" had to show probable cause, and since, according to the defendant, the State would not have been able to establish a prima facie case, the defendant claims he was greatly prejudiced. The defendant does not contend that preliminary examinations should be eliminated, only that the burden of proof should be the same in both proceedings.

The same issue was raised in *Collins v. State,* 561 P.2d 1373 (Okl.Cr.1977). In that case this Court addressed the issue as follows:

> The defendant also argues that it is a violation of the equal protection clause not to require 'the same quantum of evidence to hold one for trial by information as for indictment.' We have repeatedly held that prosecution by indictment and by information are alternative remedies available to the State, *In re McNaught,* 1 Okl.Cr. 528, 99 P. 241 (1909); *Stone v. Hope,* Okl.Cr., 488 P.2d 616 (1971); and that the State commits no violation of the Fifth or Fourteenth Amendments to the United States Constitution by electing one over the other, *Sisson v. State,* Okl. Cr., 426 P.2d 379 (1967); *Stevenson v. State,* [486 P.2d 646 (Okl.Cr.1971)]. This covers equal protection as well as due

process. The underlying concept of the equal protection clause is that of discrimination. The clause was designed to protect a person or class from being singled out as the subject of hostile or discriminatory legislation. In order to raise a claim under this doctrine a person must be able to show that he or she is a member of a class which has in fact been set apart by action of the legislature. This the defendant has not done. The procedural statutes challenged—22 O.S.1971, §§ 264 and 336 do not in fact create any classifications. The defendant argues that he is in the class of those prosecuted under Section 264 as opposed to those prosecuted under Section 336, but this is fallacious. Provision for alternate remedies is not discrimination just as provision for alternative prosecutions (where one act may constitute more than one offense) is not discrimination.

The defendant professes to find this statement "perplexing." He asserts that the two statutes involved have nothing to do with remedies; but alternative remedies are exactly what the two avenues of procedure are—remedies available to the State to redress the commission of a crime. Each avenue has its appropriate uses[2] and each avenue has its advantages and disadvantages.

The cases cited by the defendant (*Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *In re Franklin,* 7 Cal.3d 126, 101 Cal.Rptr. 553, 496 P.2d 465 (1972); *In re Gary W.,* 5 Cal.3d 296, 96 Cal.Rptr. 1, 486 P.2d 1201 (1971)) are not in point. All involved statutory schemes whereby one group of people could be de-

---

1. Practically speaking, the difference between the two procedures is not as sharp as the defendant argues. For instance, compare *Stone v. Hope,* 488 P.2d 616 (Okl.Cr.1971), in which a district attorney sought and obtained a grand jury indictment after the magistrate had found that there was not probable cause to hold the accused for trial.

2. *In re McNaught,* 1 Okl.Cr. 528, 99 P. 241 (1909), this Court made the following comment:

> We are fully satisfied that the framers of our Constitution intended to abolish the grand jury system, except that it might be invoked for those special purposes, such as the investigation of public officers, the failure of public prosecutors to do their duty, and those peculiar conditions of public disorder which sometimes arise and make prosecutions by information impracticable.

nied their freedom for a specific reason without a jury trial, while other people were entitled to a jury trial before they could be held for a similar reason; no similar denial is present in the instant case. This assignment of error is without merit.

## IV

### THE NEED FOR A PRELIMINARY EXAMINATION ON THE "BILL OF PARTICULARS"

■ The defendant also argues that the issues raised by the State's "bill of particulars" concerning the death penalty should have been heard by the magistrate before they could be presented to the jury. He maintains that he should have had a new preliminary examination after the State filed the "bill of particulars" alleging the aggravating circumstances for the death penalty. The statutes do not specify the manner in which a defendant is to be notified of the aggravating circumstances the State intends to prove. They merely provide that "[o]nly such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible." Laws 1976, 1st Exec.Sess., ch. 1, § 4, now codified as 21 O.S.1981, § 701.10.

The defendant analogizes the "bill of particulars" to the second page of an information, saying that both serve to enhance a person's punishment; and from this premise he concludes that the State's statement of evidence to be used is in reality a set of allegations of fact which must be presented to a magistrate for a consideration of probable cause. Adopting the appellant's position, however, would serve only to inject needless complications into the criminal proceeding. The purpose of the above-quoted requirement in Section 701.10 is to allow the accused an opportunity to prepare a defense. And the question then becomes one of sufficiency: How much notice is necessary to comport with due process?

The defendant was informed on September 11, 1978, that the State would seek the death penalty, and what aggravating circumstances it would seek to prove. On September 22, he was given a statement of the evidence the State intended to use during the second stage of the trial which commenced on September 27. The evidence which the State announced its intention to use was as follows: The Garfield County Court Clerk and County Sheriff were to be presented to establish that the defendant had two prior convictions; the victims of those crimes were to be called to establish that those crimes involved the use or threat of violence; all the evidence from the first stage of the trial would be adopted to show that the killing was especially heinous, atrocious or cruel, and that it was done for the purpose of escaping prosecution; and the evidence of the defendant's continuing threat to society would be expert testimony and the defendant's probation officer, who would testify to statements that the defendant had made to her "concerning his problems controlling his emotions."

In view of the nature of the evidence to be presented, this Court is of the opinion that the defendant's actual notice was sufficient to allow him to prepare his defense. There is no merit in his argument that the State's statement of evidence must be presented to the magistrate at the preliminary hearing.

## V

### IMPEACHMENT OF THE DEFENDANT'S CREDIBILITY WITH PRIOR CONVICTIONS

■ Prior to trial the defendant presented a motion in limine by which he sought to limit the State's cross-examination of him. The defendant had four (4) prior convictions: a misdemeanor (assault and battery) and three felonies (unauthorized use of a motor vehicle and two unspecified convictions which the defendant admits involved altercations with women; the State lists these convictions in its brief as assault and battery and assault with a dangerous weapon.) The defendant argued that except for the "unauthorized use" conviction the danger of prejudice to the jury was much greater than any probative value the convictions might have had, and he requested

that the judge limit impeachment, in the event the defendant took the stand, to the conviction for unauthorized use of a motor vehicle. The judge refused to do so. The defendant did not take the stand, and he now contends that because of the judge's order he was prevented from presenting his alibi defense.

We find that the alleged error was not properly preserved for review on appeal. A ruling on a motion in limine is advisory rather than final. *Teegarden v. State*, 563 P.2d 660 (Okl.Cr.1977). Thus an incorrect pretrial ruling will not be deemed to constitute prejudicial error. The error occurs when the party raises the issue during the trial and the judge rules incorrectly at that time. Since the defendant chose not to take the stand, the admissibility of the convictions was never placed in issue and there is no ruling of the trial court for this Court to review.

## VI

### THE EXCLUSION OF JURORS BECAUSE OF OBJECTIONS TO THE DEATH PENALTY

In this assignment of error, defendant complains of the exclusion of two jurors, Ms. Morrison and Ms. Fuksa, alleging a violation of the United States Supreme Court decision of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

■ A review of the record[3] discloses that Ms. Morrison was properly excused. One of the permissible bases for exclusion mentioned in *Witherspoon*, supra, is that the prospective juror has decided in advance that the death penalty is not even a possibility to consider. Applying this standard we conclude that Ms. Morrison was properly excused.

As to Juror Fuksa the record reveals that she did not believe in the death penalty.[4] Following her statement, the defense counsel asked a few questions successfully designed to elicit from her that she would at least consider it. The prosecutor then asked a series of questions successfully designed to re-elicit from her previous statement that she would not vote to have the defendant executed, regardless of the evidence. When the entire exchange is read, the juror is clearly saying that while she could conceive of situations in which the death penalty would be an appropriate punishment, she could never be the person to impose it. This juror, also, was correctly excused. Compare *Chaney v. State*, 612 P.2d 269 (Okl.Cr.1980).

In addition to these two specific challenges, the defendant alleges that every one of the State's peremptory challenges was against a person who had hesitated at the thought of imposing the death penalty, and that the challenges for cause were based on the juror's doubts about the death penalty. A review of the voir dire demonstrates that neither of these accusations are true.

It is obvious from the defendant's brief that he understands the test of *Witherspoon:*

> The plain meaning of this language is: Judges may properly exclude jurors who would 'automatically' vote against the imposition of capital punishment no matter what the trial might reveal or who might make it 'unmistakeably [sic] clear' that their opposition to the death penalty would prevent them from even convicting a man who would later receive the death penalty.

But, he is incorrect when he argues that the jurors excluded at his trial do not fit this test. This assignment is without merit.

## VII

### THE ADMISSIBILITY OF TESTIMONY

The defendant presents two assignments of error objecting to the admission of certain testimony. The first one involves two witnesses who testified concerning statements the defendant had made to them; the second concerns the testimony of an expert witness.

---

**3.** See Appendix A.

**4.** Appendix B.

## A.

■ The defendant complains that the trial court had granted a pretrial motion in which the defendant requested "[w]ritten statements or the contents of oral statements made by the defendant herein, . . ."; but, during the trial Theodore King and Debbie Kretchmar testified to statements that the defendant had told them, even though the defendant had not been given copies of those statements.

Theodore King occupied the cell next to the defendant in the county jail, and he testified that the defendant said he had not meant to kill the woman. The defendant objected to King's testimony and the trial court held an in-camera hearing beforehand, ruling that the testimony was proper. The defendant suggests that the trial court misunderstood the precise nature of his objection: The court's ruling was based on the fact that Mr. King was endorsed as a witness and the defendant had an opportunity before the trial to interview him, but the defendant's objection was that under the pre-trial order the State should have furnished him with a copy of King's statement.

The defendant cites *Wing v. State,* 490 P.2d 1376 (Okl.Cr.1971), wherein we held that a defendant should be able to discover the contents of oral statements, but *Wing* does not apply to the present case. It is clear from the opinion that this Court was talking about oral statements given to law enforcement officers. The transcript of the present case indicates that the defendant was aware of this limitation, because he sought to establish that Mr. King had been designedly placed next to him for the purpose of drawing him out on the subject of the murder. Had he been able to do so he might have been able to suppress Mr. King's testimony under *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), but he did not. The statement to Mr. King was not the result of interrogation and, therefore, the State was not obliged to provide the defendant with a copy of it. It follows that the trial court's ruling was correct. The defendant was on notice that Mr. King would testify; it was his responsibility to determine what the substance of that testimony would be.

■ Debbie Kretchmar's testimony is easily treated. She was the defendant's probation officer after a previous conviction. Her statements related to the defendant's repeated attacks on women and the likelihood that he would be a continuing threat to society. Not only does the above discussion of *Wing,* supra, apply (the statements were not the result of interrogation), but the defendant did not object to Ms. Kretchmar's testimony during the trial. Hence, he has not properly preserved this issue for appeal.

## B.

■ Next, the defendant challenges the testimony of the county medical examiner, who testified that in his opinion some of the marks in the mud around the body could have been made by a person with an artificial limb. The defendant argues that the doctor was not qualified to testify as an expert on prosthetic devices. He emphasizes the doctor's lack of experience in dealing with artificial limbs; but he fails to consider that expert knowledge can be acquired through study as well as from experience. Compare, *Riggle v. State,* 585 P.2d 1382 (Okl.Cr.1978), in which a man only five days out of medical school was allowed to give expert testimony as to the victim's wounds and the possible cause of death. The doctor's qualifications were placed before the jury. On cross-examination the defense attorney elicited the doctor's lack of experience and the fact that it was only on the day before the trial that he had surmised that the prints in the mud were caused by an artificial limb. The probative value of the doctor's testimony was for the jury to determine. This assignment is without merit.

## VIII.

### PREJUDICIAL REMARKS BY JUDGE AND PROSECUTOR

This assignment of error is actually several independent issues combined under a

single heading. For clarity they will be discussed separately.

## A.

During the second stage of the trial the defendant introduced a letter from a psychiatrist to the defendant's attorney concerning one of the defendant's prior cases. The doctor diagnosed the defendant as schizophrenic and recommended long-term psychotherapy. In rebuttal, the State introduced a letter from a State psychiatrist to the district court in the same or a contemporary case (one letter was written in March, 1976, the other in September, 1976). The State doctor diagnosed the defendant as non-psychotic. He described the defendant as having an anti-social personality and said that the condition was not treatable. The letter also stated that further anti-social acts could be anticipated, and that in the event they did happen the defendant should be placed in prison rather than in a mental hospital. Neither doctor was called to testify. On appeal the defendant urges that the State's letter was highly inflammatory hearsay and should not have been admitted without the author present to be cross-examined.

■ The State replies that if any error was committed in the admission of the letter, it was invited by the admission of the defendant's letter. But the argument is based on a misconception, because there was no error in the admission of the defendant's letter. The State stipulated to the admissibility of that letter "without further proof or identification or authenticity and without the necessity of calling [the author]." Thus, any hearsay problems which might have arisen concerning the defendant's letter were waived by the State, and the State cannot now attempt to use that letter to solve the hearsay problems of its own letter. The State did not seek a stipulation from the defendant.

■ The present evidence code became effective in the middle of the trial of the present case. The trial began September 27, 1978, and ended October 5, 1978, and the code became effective on October 1. Under the prior rules of evidence the admission of the letter without the doctor's presence would have been improper. *Bennett v. State,* 448 P.2d 253 (Okl.Cr.1968), held that a hearsay medical opinion could not be made admissible merely by authenticating it as an official record. The declarant doctor had to be present in court and subject to cross-examination. See also *Fry v. State,* 529 P.2d 521 (Okl.Cr.1974). However, the letter under discussion was introduced on the last day of the trial, and the question must be decided under the new code. The relevant section of the code provides as follows:

Any form of memorandum, report, record or data compilation of acts, events, conditions, opinions or diagnosis, made at or near the time by or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. ·The term "business" as used in this paragraph includes business, institution, association, profession, occupation and calling of every kind, whether or not conducted for profit; 12 O.S.1981, § 2803(6).

The problem in the present case is in the phrase: ". . . all as shown by the testimony of the custodian or other qualified witness, . . ." The letter purports to be a report of a medical opinion, made at or near the time the defendant was under observation at the hospital, by a person with knowledge of that observation and its results; and it is allegedly the regular practice of the hospital to make such reports to the district courts. But the witness the State chose to present was the Garfield County Court Clerk, who testified that the letter was a part of the district court file of a previous case involving the defendant.

This was not the type of qualification needed to support the admissibility of the letter. The "custodian or other qualified witness" should have been someone from the hospital who could have testified as to how the regular business of the hospital is conducted concerning observation and reporting. It was not necessary to call the doctor who wrote the letter, but it was necessary to call someone who could testify that the report was in fact made at or near the time and by, or from information transmitted by, a person with knowledge of the circumstances reported. It was error for the trial court to admit the letter.

The error does not necessitate the reversal of the conviction, however. Since it came during the second stage of the trial, it did not influence the jury's finding of guilt. Further, the letter was not prejudicial in regard to the death sentence. The jury had before it the evidence of the defendant's four prior convictions, three of which involved attacks on women, committed in the space of three years. With or without the letter from the State psychiatrist, there can be no question that the jury would have found that the probability existed that the defendant would be a continuing threat to society.

### B.

■ In the second part of this assignment, the defendant objects to the district attorney's cross-examination of the defendant's wife during the second stage, portions of the State's closing arguments in both stages and a comment by the trial judge during the second stage. After careful review of those portions of the record where proper objections were entered, this Court is of the opinion that none of the comments created unfair prejudice in the minds of the jurors. The comment made during the first stage closing argument concerned, not the guilt of the defendant, but the length of the sentence to be imposed in the event the jury convicted the defendant of manslaughter. Nor did any of the second-stage incidents prejudice the defendant. The State clearly proved all of the alleged aggravat-

ing circumstances. (Indeed, the defendant's attorney conceded so during his closing, arguing that even though all four circumstances existed, death was not an appropriate punishment.) If any of the events of which the defendant complains were improper, they were relatively minor when viewed in the full light of the circumstances of the case. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This assignment is without merit.

### IX.

### THE CONSTITUTIONALITY OF THE DEATH PENALTY

■ Finally, the defendant argues that Oklahoma's death penalty statutes are unconstitutional. He first contends that 21 O.S.1981, § 701.10, allows unbridled discretion on the part of the jury when assessing the appropriate penalty. This is not true. The jury is limited in the aggravating circumstances it can consider to those of which the defendant was informed before trial, section 701.10, supra; it must find that the circumstances were proved beyond a reasonable doubt, 21 O.S.1981, § 701.11; nor is the jury restricted on mitigating circumstances, by statute, Section 701.10, supra, and court instruction, the jury was limited to mitigating circumstances it could find from the evidence. Further, in the present case the judge gave the jury guidance, in the form of example mitigating circumstances.

The defendant's second contention is that the phrase "heinous, atrocious, or cruel" is unconstitutionally vague. This argument was rejected in *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980); the instruction given to the jury defining the phrase was the same as the one approved in *Chaney.* This assignment is without merit.

### THE APPROPRIATENESS OF THE DEATH PENALTY

■ Title 21 O.S.1981, § 701.13, requires this Court to consider the appropriateness of the death sentence in addition to the errors raised on appeal.

In light of my colleagues' view that the punishment should be modified from death to life imprisonment, I wish only to voice my disagreement with such modification, believing as I do, that the evidence amply supported the finding of the aggravated circumstances, and that the sentence of death was not imposed "under the influence of passion, prejudice, or any other arbitrary factor." 21 O.S.1981, § 701.13(C)(1).

The judgment and sentence is Modified from a sentence of death to a term of life imprisonment, and AS SO MODIFIED, is Affirmed.

CORNISH and BRETT, JJ., specially concur.

BRETT, Judge, specially concurring:

I agree with Judge Bussey that the evidence in this case amply supports the finding of the aggravated circumstances. At the same time, the prosecutor's statements during closing argument to both stages of this murder trial were such that the jury would have had difficulty not being prejudicially influenced by collateral matters. Although there were not objections to all comments, and although the trial court did not rule on all objections entered, I believe that relief must be granted for the following reasons: There were timely objections at crucial points; the comments directly bore upon the choice of penalty and the jury was influenced by these references, as evidenced by their question sent back to the judge during deliberations; and the affirmance of a case in which the death penalty has been assessed requires that the trial court be particularly cognizant of any prejudicial influence on the jury.

At the close of the first stage, there were two types of objectionable comments by the District Attorney. First, there were repeated references to the defense attorney's efforts to "con" the jury. Casting aspersions on the conduct of opposing counsel cannot be interpreted as a fair interpretation of and comment on the evidence at trial. Second, the prosecutor blatantly alluded to parole immediately following a statement of his personal opinion in the following excerpt:

[PROSECUTOR]: And I might be at fault a little bit in doing it, but in my own personal opinion, if you don't think it is murder—

MR. JONES: If the Court please, I object to counsel's personal opinion.

[PROSECUTOR]: Based on this evidence, ladies and gentlemen—

THE COURT: He may express his conclusions from the evidence.

[PROSECUTOR]: Based on this evidence, in my opinion, if you don't think it is murder in the first degree, then I would suggest, as Mr. Jones has said, that the penalty of manslaughter could be anything up to 5000 years, and I would rather you find him guilty of manslaughter in the first degree and give him 2000 years in the penitentiary so that maybe within twenty-five or thirty years he might actually be there some ten years in the penitentiary, so that he can't go out and rape and ravish and kill somebody else again.

MR. JONES: If the Court please, I object to that and ask that it be stricken.

[PROSECUTOR]: So that you take that evidence you have there and, if you cannot, if your own heart and conscience, say that man killed the woman, murder in the first degree, then you find that lesser offense, but put him in the penitentiary for long enough that he can't do it again. Thank you.

\*　　\*　　\*　　\*　　\*　　\*

MR. JONES: Your Honor, may we approach the bench just one second?

THE COURT: Very well.

MR. JONES: (In low tones at the bench) I made an objection, Your Honor. I objected to Mr. Hoch's remarks about giving him 2000 years in the penitentiary so he would serve twenty-five or thirty or ten, and I ask that the jury be admonished to disregard that and I move to strike it before they leave the room.

THE COURT: (In low tones) I didn't hear it the same way, *therefore the objection is overruled and the request denied.* (Emphasis added)

At the conclusion of the second stage, additional comments were error. A reference to the parole status of the appellant at the time of trial was made without objection. This Court has stated the basis for the rule on preservation of error by objection as follows: "The policy considerations underlying this rule are to draw the alleged error to the attention of the trial court and to provide that court an opportunity to correct any error at the time of trial." *Myers v. State,* 623 P.2d 1035 (Okl.Cr.1981). However, that policy was not deterred in the case now before us, where the judge had already overruled the defense's objection to a similar comment on parole.

At least four comments had the effect of placing the jurors in the posture of community watchdogs. The District Attorney also expressed his own regret at a prior leniency toward this same appellant and he warned the jury to avoid that same mistake. The appellant objected but the objection was overruled in the following:

> [B]ut what about the family of poor Eunice Mason? Are they to be considered or must we forget about those? And the other families to come? Because you have to be the protector, based on that evidence, and, ladies and gentlemen, there is one thing I must tell you. There is one person who must share a large portion of the blame for Eunice Mason's death, and I am that person, and it hurts me to say that I must share that, because, as first assistant for the five counties, I am responsible for all ultimate decisions that any assistant makes in any of those five counties, and in this particular case, involving this man, I made a decision—
>
> MR. JONES: If Your Honor please, I believe this is outside the scope of the evidence.
>
> THE COURT: I do not know at this stage. You are cautioned stay within evidence.
>
> [PROSECUTOR]: As shown by the records here in case no. CRF–76–154, assault with a dangerous weapon, as well as the other, based upon the report submitted to you for your consideration from Dr. Adel-

man, and I must say I have no quarrel with Dr. Adelman because I have to agree that Dr. Adelman is probably one of the finest psychiatrists in the State of Oklahoma and that Garfield County is most fortunate to have such a person here to take care of some of the problems that we have, and I relied upon his statement, even though—

> MR. JONES: Your Honor, I object. This is outside the scope of evidence. This is improper argument, what Mr. Hoch relied upon.
>
> THE COURT: Overruled. Proceed.
>
> MR. JONES: Note our objection and exception.
>
> [PROSECUTOR]: This letter was written to Mr. Stephen Jones, who, in the judgment and sentence in the case I just referred to, was the attorney for Mr. William Denton Jones at that time. Not only had Mr. William Denton Jones had a suspended sentence on unauthorized use of a motor vehicle, whereby he agreed to abide by all rules and regulations of probation, that has been attached to and made an exhibit, Mr. William Denton Jones agreed not to violate any law; that he would be a good model citizen and not do other type things, and if he violated any of those, he was to be revoked and sent to the penitentiary, and we have him going to Tulsa, Oklahoma, where he was convicted of this crime of assault and battery. A good, old, self-pitied D.A. didn't revoke him, but gave him a chance. We came around and, based upon the facts represented to us, and disregarding the facts from another person in another exhibit, we relied upon Dr. Adelman and we gave him another chance.
>
> MR. JONES: Your Honor, we again renew our objection. This is not in regard to any evidence.
>
> THE COURT: You are again overruled. This is much closer to the evidence than Sir Winston Churchill.
>
> MR. JONES: I object to Your Honor's statement as prejudicial.
>
>    \*    \*    \*    \*    \*    \*

[B]ut you now know and, ladies and gentlemen, you only have to answer to yourselves and to your family and you can say, "Am I going to take and protect the people of Garfield County? Am I going to take and fulfill my duty or am I going to take and be derelict in it and forget about the law and disregard the evidence and let the same thing happen?" And I pray to you and I beg of you and pray to God that you don't make the same mistake that I made, because I will live with it as long as Eunice Mason—as I can remember that fact that I was responsible for her death. Please for God's sake, don't make the same mistake.

Then, the prosecutor dealt his final blow with his reference to the intervention of God. He admonished the jurors that if their decision to impose death were an error, God would intervene:

Go by what you know, and you go out to that jury room and you be the protector that you are and you do your duty and you find those four elements, as we all know, exist and then you reach over there and you take that one verdict that says death and sign it, like you know that the evidence and the law says, and the only thing that you need to say to Mr. William Denton Jones, if anything at all, is, if and when you write that verdict, "God have mercy on his soul," and you let God worry about the future of Mr. William Denton Jones because, if God says that he shall not die, he will take and cause that force to intervene between the time that you do it and the time that it is set for his final execution, and you know that as well as I do.

MR. JONES: To which we object, Your Honor, as improper.

The court did not rule on the defense objection.

My concern that the jury was improperly led to consider the effect of parole is verified by the following portion of the transcript:

THE COURT: (Thereafter, at the hour of 3:53 o'clock p.m., of said day, the jury returned into court, with all appearances being as before, except that Mrs. Shaw was not present.)

THE COURT: Has the jury reached a verdict?

JUROR: No, Your Honor. We have a question that we would like to ask and see if we could get answered.

THE COURT: You may state the question and then we will determine whether or not it can be answered.

JUROR: The jury would like to know if there is a minimum number of years that must be served on a life sentence before one is eligible for parole, or may it just stipulate "no parole"?

THE COURT: Will counsel approach the bench, please? (Off-the-record-discussion in low tones at the bench between Court and counsel.)

THE COURT: With regard to your question, parole is not a matter of consideration by either the jury or the Court, therefore I can give no answer to either part of the question.

This was a heinous crime and the conviction is sound. However, I cannot, in good conscience, affirm the sentence of death in light of the obvious prejudice effected by the statements made by the District Attorney during closing arguments. Therefore, I concur that the death sentence imposed should be modified to the sentence of life imprisonment, and as modified, affirmed.

I am authorized to state that Judge CORNISH concurs in my views.

### APPENDIX A

The relevant portion of Ms. Morrison's voir dire is as follows:

MR. HOCH: You understand the Court is going to do all the instructing and will decide all questions of law and all questions of procedure?

JUROR MORRISON: Right.

MR. HOCH: That all of us must abide by those decisions, whether we like it or not? You understand that?

JUROR MORRISON: Yes.

MR. HOCH: And you can do that without any difficulty?

JUROR MORRISON: To a point.

MR. HOCH: Well, if the Court gives you a particular instruction which you don't like, is that—

JUROR MORRISON: Well, my thinking is this. I could find a man guilty, but I could not condemn him to death.

MR. HOCH: I will ask the question this way. If the Court tells you, after you have heard all the evidence and the Court defines the material elements, and you go out and you decide and all the jurors decide the defendant is guilty of murder in the first degree beyond a reasonable doubt—you have decided—that question—then it came down to the question, if the Court gave you an instruction that in a proper case, where the facts and circumstances were such that it was justified, the death penalty, could you impose the death penalty without doing violence to your conscience?

JUROR MORRISON: No, I do not think my religious belief would allow it.

MR. HOCH: Let me ask you this. In that event, after you have heard all the evidence and there is no question about his guilt and all the evidence is overwhelming as to the facts and circumstances and all the conditions that the Court gives to you, and that this is a proper case, irregardless of what the evidence may be, if the Court instructed you, you would refuse to impose the death penalty?

JUROR MORRISON: I would find him guilty, but not sentence him to death.

MR. HOCH: I will challenge her for cause.

THE COURT: You may step down, Mrs. Morrison.

### APPENDIX B

The relevant portion of Ms. Fuksa's voir dire is several pages long, but the following quote gives the substance of it:

MR. HOCH: Well, let me ask you this. If you are selected as a juror here and required to be a juror, can you give this case your full and undivided attention all the time that you are here?

JUROR FUKSA: Well, yes, but I couldn't sentence anybody. My conscience wouldn't let me.

MR. HOCH: I didn't hear.

JUROR FUKSA: I couldn't sentence anybody. My conscience wouldn't let me. I told that once before. I couldn't live with myself.

MR. HOCH: Let me ask you this question. If you had determined the question of guilt and you found the defendant guilty beyond a reasonable doubt and the Court gives you an instruction that under the law, if certain facts and circumstances exist, that you can consider the death penalty in a certain case, in a proper case, are you saying that you could not consider the death penalty without doing violence to your conscience?

JUROR FUKSA: I couldn't.

MR. HOCH: Irregardless [sic] of what the evidence might be, the facts and circumstances surrounding this particular crime, and the fact that the Court gives you instructions that certain things exist, if you find all those exist, would you still refuse to consider the death penalty?

JUROR FUKSA: Yes.