Filed 5/9/13  P. v. Collier CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>BRENT MELTON COLLIER,<br><br>　　　Defendant and Appellant. | H036720<br>(Santa Clara County<br>Super. Ct. No. 162764) |

## I.  STATEMENT OF THE CASE

Defendant Brent Melton Collier appeals from an order extending his involuntary commitment to a state hospital as a mentally disordered offender (MDO).  (Pen. Code, § 2972.)[1]  He claims the court violated his statutory and constitutional rights by failing to advise him of his right to a jury trial and then conducting a bench trial without obtaining his personal waiver.

We affirm the order.

## II.  BACKGROUND, PROCEDURAL HISTORY, AND EXTENSION TRIAL

In 1992, defendant got onto a bus.  He was hallucinating and threw a rock at the bus driver, who he thought was an undercover agent.  The driver suffered serious bodily injury.  At the time, defendant was under the influence of controlled substances and had

---

[1] All unspecified statutory references are to the Penal Code.

stopped taking medication for his mental disorder. Defendant was later convicted of assault on a transportation worker.

In 1994, while serving his prison term, defendant was transferred to Atastcadero State Hospital for mental health treatment, and he was later certified as an MDO. (§§ 2684; 2966.) When his prison term expired, he was committed as an MDO, and his commitment has been extended periodically. (§§ 2970-2972.)

On November 17, 2010, before the commitment was set to expire, the Santa Clara District Attorney filed a petition to extend it. (§ 2972.) On March 17, 2011, the court conducted a bench trial on the petition.

Dr. Flavia Gorge, defendant's treating psychologist at Patton State Hospital, testified that defendant suffered from schizophrenia, polysubstance abuse, and polydipsia—i.e., excessive water drinking—which lowered his sodium levels, created a form of intoxication, and diluted his psychotropic medication, which made him more agitated, aggressive, irritable, and delusional and reduced his impulse control.

Dr. Gorge opined that defendant currently represented a significant risk of harm to others due to his mental illness. She reported that defendant had committed two acts of violence against peers or staff during the past year. In one incident, defendant got angry and threw water on a staff member during a one-on-one observation of defendant's roommate. The roommate reported, and defendant later admitted, that he threatened to kill the staff member. In another incident, he got angry and threw a chair at a patient.

Dr. Gorge explained that to sustain a long-term treatment program, defendant had to comply with medication orders and gain insight into his condition. She testified that although defendant was currently compliant, he had not consistently complied with all of his medication orders. He also did not consistently admit that he has schizophrenia, and at times, he minimized or denied it. Dr. Gorge also explained that having wellness, safety, and recovery plans would help defendant recognize his symptoms and the events

2

that triggered his psychosis. However, defendant he was not "at that stage yet," and he had not begun the process of understanding a relapse prevention program. He was attending group sessions and making small steps in stabilizing his condition, but even with medication, he remained a danger to others. Dr. Gorge further opined that it was premature to venture an opinion concerning whether he would continue to take his medication if he were released.

Defendant testified at the hearing. At time, he rambled. At others time, he had difficulty providing pertinent responses to questions. He said that his primarily disorder was grandiosity, but he admitted having a little schizophrenia, which he believed everyone has some symptoms of, and some paranoia. He said he would not now throw a rock at anyone regardless of whether they were spying on him. When asked how he would cope with his condition if released, he explained, "As long as there's no foghorns when I'm walking in the street in San Francisco yelling at me, might have mother's voice or nobody, when I'm driving down the road, nobody taking no gnarly left turn cutting me off in the traffic running red lights or anything. Nothing in particular happening to me that's too coincidental for my mind to handle maintain my sanity with, then I'm okay. If it happens all the time everywhere I go I get a little bit confused." When asked if he meant that he would "stay inside," he responded, "Just the Internet opened up. The world has changed, especially in California. You can have deliveries. You can have your groceries delivered at home including your medications. And I've got plenty—my two sisters and my mother are ready to provide me with any amount of money it takes to pay for my medications and the local human health services department of mental health in Los Gatos provide me with my prescription."

Defendant admitted that he needed to take medication. He listed some he was taking and said he was an expert on psychotropics. He admitted the acts of violence described above. He claimed that he threw the chair because the other patient had

3

threatened him. He threw water in a staff member's face because the person was disrespecting him. He believed members of the staff were not as professional as he expected them to be considering how much money they were being paid. He suggested that he got respect from other patients for "being as mental" as they were.

Defendant agreed with Dr. Gorge that he was doing much better, but he wanted a second opinion because he thought there might be one pill that would relieve him of all his symptoms. He said his mental illness began when he was 10. He said he understood that he suffered from schizophrenia and had to take medication to control it. He said he has been compliant and as a result remained "clean and sober" and "[c]lean in hygiene and assault free living." He believed that his mental disorder was in remission because he was taking medication and said he would continue to take his medication forever if released. He admitted being addicted to coffee and cigarettes and enjoying medicinal marijuana and a glass of wine with food. However, he knew that he could not use marijuana or alcohol again if released. He also said he would not drink too much water because of how it affected him. He said he was "gung ho" about working on a wellness and recovery plan and believed he was ready for immediate release from the hospital. He explained, "[T]his is just a cry for help, okay? I've been, you know, I think I need either a second opinion or I need a second opinion or a transfer to some other facility. I don't think Patton is for me. I'm tired of being down with the homies. I'm like throwing a chair at him and having a good time with the boys, hurt somebody, or I'm tired of just getting along. I've been threatened by staff before, but I won't mention any names. And I'm just—I'm tired of putting on the ritz. I put on the ritz for my family, everything, my employers, and my professors that taught me everything I know, and when it's boils down to putting on the ritz for the work, it's more than carrying the world on your shoulders, you know."

4

After hearing the witnesses, the court found that defendant posed a danger to others due to his mental illness and extended his commitment.

### III. THE MDO COMMITMENT SCHEME AND EXTENSION PROCEDURE

The Mentally Disordered Offender Act (the Act) (§ 2960 et seq.) permits the state to involuntary commit persons who have been convicted of a violent crime related to their mental disorders to a mental hospital for treatment until their disorders can be kept in remission. (*In re Qawi* (2004) 32 Cal.4th 1, 9 (*Qawi*); see *Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061 (*Lopez*) [the MDO Act has the dual purpose of protecting the public while treating severely mentally ill offenders].)

The Act provides treatment at three stages of commitment: as a condition of parole, in conjunction with the extension of parole, and following release from parole. (*Lopez, supra*, 50 Cal.4th at p. 1061.) "Sections 2970 and 2972 govern the third and final commitment phase, once parole is terminated. If continued treatment is sought, the district attorney must file a petition in the superior court alleging that the individual suffers from a severe mental disorder that is not in remission, and that he or she poses a substantial risk of harm. (§ 2970.)" (*Lopez, supra*, 50 Cal.4th at p. 1063.)

Section 2972, subdivision (a) provides, among other things, that when a petition is filed, the court "shall advise the person . . . of the right to a jury trial"; and "the trial shall be by jury unless waived by both the person and the district attorney."[2]

---

[2]  Section 2972, subdivision (a) provides, "(a) The court shall conduct a hearing on the petition under Section 2970 for continued treatment. The court shall advise the person of his or her right to be represented by an attorney and of the right to a jury trial. The attorney for the person shall be given a copy of the petition, and any supporting documents. The hearing shall be a civil hearing, however, in order to reduce costs the rules of criminal discovery, as well as civil discovery, shall be applicable. [¶] The standard of proof under this section shall be proof beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict. The trial shall be by jury unless waived by both the person and the district attorney. The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown."

## IV. CONTENTIONS

Initially the record on appeal did not reflect a jury advisement or an express waiver. For these reasons, defendant claimed the court violated his right to a jury trial first by failing to advise him and then by failing to obtain his personal waiver. Defendant acknowledged that in *People v. Otis* (1999) 70 Cal.App.4th 1174 (*Otis*) and *People v. Montoya* (2001) 86 Cal.App.4th 825, 829 (*Montoya*), the courts said that counsel had authority to waive a jury trial even over an MDO's objection. However, defendant argued these cases were wrongly decided. According to defendant, a competent MDO has the right to decide whether to waive a jury.

After defendant's opening brief was filed, the Attorney General requested, and we issued, an order directing the trial court to prepare a settled statement concerning any unrecorded conference at which the jury issue was discussed. In its statement, the court explained that on February 4, 2011, pursuant to its custom and practice, the court called defense counsel and the prosecutor into chambers. Defendant was not present. At that time, defense counsel requested a trial, and then both he and the prosecutor waived a jury.

In respondent's brief, the Attorney General noted counsel's express waiver and, citing *Otis* and *Montoya*, argued that the Act does not require an MDO's personal waiver or allow an MDO to veto or overrule a decision by counsel to waive a jury trial. The Attorney General also argued that any alleged errors in failing to advise and conducting a bench trial were harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

In a supplemental opening brief, defendant acknowledges counsel's waiver but claims the failure to advise him violated not only his statutory right to an advisement but also his federal constitutional rights to due process and equal protection. He claims that even if counsel can waive a jury over an MDO's objection, the court erred in accepting counsel's waiver because the record did not show that defendant knew about his right to a jury trial, discussed it with counsel, and agreed to counsel's waiver.

6

In the supplemental respondent's brief, the Attorney General argues that counsel's waiver of defendant's presence at pretrial hearings and his waiver of a jury trial either forfeited any claim of error based on the failure to advise or rendered such a claim moot. The Attorney General further argues that the alleged failure to advise did not violate defendant's federal constitutional rights to due process and equal protection. The Attorney General again argues that under the Act, counsel has exclusive control over the decision to waive a jury. Last, the Attorney General claims that any alleged statutory violations are harmless.

## V. FAILURE TO ADVISE

As noted, section 2972, subdivision (a) requires the court to "advise the person of his or her right . . . to a jury trial." This language imposes a mandatory duty on the court.[3] (*Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 542 [" 'shall' " typically construed as mandatory; e.g., *People v. Tindall* (2000) 24 Cal.4th 767, 772.) It reflects a legislative intent to judicially ensure that "the person" knows that he or she has the right to a jury trial.

It is undisputed that the court did not directly advise defendant on the record before trial. Moreover, as the Attorney General notes, counsel waived defendant's presence at every pretrial hearing, and defendant did not make his first appearance until March 17, the day of the bench trial. However, contrary to defendant's claim, the court's failure advise him does not compel reversal.

Before any judgment can be reversed for error under state law, it must appear that the error complained of "has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801.) This means that reversal is justified "when the court, 'after an examination of the entire cause, including the

---

[3] We mean "mandatory" in its obligatory, rather than jurisdictional, sense as in a required, rather than discretionary, action. (See *Morris v. County of Marin* (1977) 18 Cal.3d 901, 908 [discussing distinction].)

evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d 818, 836.)

It is beyond dispute that counsel was aware of defendant's right to a jury trial. Where, as here, counsel waives an MDO's presence at pretrial hearings, effectively preventing a direct judicial advisement before trial, the court may reasonably expect counsel to discuss all pertinent matters that will arise or that have arisen in pretrial hearings, including the right to a jury trial and whether to have one. Indeed, "[l]ike all lawyers, the court-appointed attorney is obligated to keep her client fully informed about the proceedings at hand, *to advise the client of his rights*, and to vigorously advocate on his behalf. [Citations.] The attorney must also refrain from any act or representation that misleads the court. (Bus. & Prof.Code, § 6068, subd. (d); Rules Prof. Conduct, rule 5–200(B).)" (*In re Conservatorship of Person of John L.* (2010) 48 Cal.4th 131, 151-152 (*John L.*), italics added.) Moreover, absent a showing to the contrary, "[a] reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; *Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1566; e.g., *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 272 (*Mary K.*) [where no evidence to the contrary, court may presume counsel discussed jury waiver with client before waiving on client's behalf].)

Under the circumstances and in the absence of evidence to the contrary, we may presume that counsel discussed the jury issue with defendant. Moreover, the record does not suggest that defendant was unaware of his right to a jury trial notwithstanding the lack of a direct judicial advisement. We note that this was not the first time defendant's MDO commitment had been extended. More importantly, the record does not suggest

8

that defendant was unaware that counsel intended to waive a jury and had done so or that counsel acted without defendant's knowledge or consent or that defendant wanted a jury trial and objected (or would have objected) to counsel's waiver. Any such inferences would be pure speculation on our part.[4]

Last, we note that a single opinion by a psychiatric expert that the defendant is currently dangerous due to a mental disorder can constitute substantial evidence to support the extension of a commitment. (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165; *People v. Bowers* (2006) 145 Cal.App.4th 870, 879.)

Dr. Gorge's testimony represents overwhelming evidence to support the court's finding that defendant posed a risk of harm due to mental disorders that were not in remission. As noted, Dr. Gorge explained that defendant's excessive water consumption diluted his medication, made him more prone to become agitated, aggressive, irritable, and delusional, and reduced his impulse control. She noted that he had made threats and been violent at the hospital during the past year. She observed that he was not always compliant with his mediation orders, he did not consistently admit his schizophrenia, and at times denied it. She considered it premature to offer an opinion about whether defendant would take his medication if released. And she said that defendant had not yet developed a wellness, safety, and recovery plan, which would help him recognize his symptoms and the events that trigger is psychosis.

Defendant offered no expert testimony, and his own testimony had no tendency to impeach Dr. Gorge's credibility or undermine her analysis and opinion. On the contrary, defendant rambled, and his testimony was at times disjointed. Defendant believed that

---

[4] If, in fact, defendant was unaware of his right to a jury trial and would have or did oppose counsel's waiver, but the evidence to establish these facts lay outside the record on appeal, defendant had the alternative a remedy of habeas corpus to challenge his commitment on the ground of ineffective assistance of counsel. (See *People v. Gray* (2005) 37 Cal.4th 168, 211 [claims grounded in facts outside the record can be raised by habeas petition]; *In re Bower* (1985) 38 Cal.3d 865, 872.)

his mental disorder was in remission and that he was ready for immediate release because he was taking medication and said he would continue to do so. However, his explanation for how he would cope if released made little sense.

Under the circumstances, we do not find it reasonably possible, let alone reasonably probable, that defendant would have obtained a more favorable result had the court ordered his presence at a pretrial hearing and expressly advised him about the right to a jury trial. (*Watson, supra,* 46 Cal.2d at p. 836; cf. *People v. McClellan* (1993) 6 Cal.4th 367, 377, 378 [failure to advise about sex registration requirement harmless].)[5]

Presumably to invoke the more stringent harmless-error test applicable to federal constitutional errors (see *Chapman v. California* (1967) 386 U.S. 1, 24 [harmless beyond a reasonable doubt]), defendant claims the court's failure to advise him violated his federal constitutional rights.

Citing *Hicks v. Oklahoma* (1980) 447 U.S. 343 (*Hicks*), defendant argues that the state's failure to comply with its own statutes and its decision to commit him without complying with those statutes violated his due process rights. However, defendant's reliance on *Hicks* is misplaced.

The United States Supreme Court has not cited *Hicks* for the proposition asserted by defendant. "[The United States Supreme Court has] long recognized that a 'mere error of state law' is not a denial of due process. [Citation.] If the contrary were true, then 'every erroneous decision by a state court on state law would come [to this Court] as

---

[5] We do not intend to suggest that it was improper or inappropriate for counsel to waive defendant's presence or that the court had a duty to order defendant's presence in order to directly advise him. However, a direct advisement is not the only way for the court to ensure that an MDO is made aware of the right to a jury trial. In our view, the practical difficulty in advising an MDO committed to a state hospital could easily be solved with an advisement and waiver form for the MDO read and sign. (See *People v. Ramirez* (1999) 71 Cal.App.4th 519, 521-522 [waiver form proper substitute for judicial advisement].)

a federal constitutional question.' [Citations.]" (*Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21.)  Due process does not safeguard "the meticulous observance of state procedural prescriptions . . . . " (*Rivera v. Illinois* (2009) 556 U.S. 148, 158 ["Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution].)

In *Montoya, supra*, 86 Cal.App.4th 825, the court rejected the MDO's claim that the federal due process clause guaranteed an MDO the right to a jury trial. " 'Where . . . a State has provided for the *imposition of criminal punishment* in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law.  The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, [citation], and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.' [Citation.]  A jury sitting in a civil hearing pursuant to sections 2970 and 2972 does not impose criminal punishment and has no power to determine the extent to which the defendant will be deprived of his liberty. Defendant's jury trial interest thus is, in this case, 'merely a matter of state procedural law' and does not implicate the Fourteenth Amendment.  [Citation].) (*Id*. at pp. 831-832, quoting *Hicks, supra,* 447 U.S. at p. 340.)

*Montoya's* analysis applies to defendant's claim that due process guarantees the right to *a jury advisement.*  The required advisement does not create a state liberty interest, and a court's failure to advise does not deprive defendant of any liberty interest. (See *Swarthout v. Cooke* (2011) ___ U.S. ___ [131 S.Ct. 859, 862] ["When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication—and federal courts will review the application of those constitutionally

11

required procedures."]; e.g., *People v. Letner* (2010) 50 Cal.4th 99, 195.)  Rather, like the right to a jury trial itself, the required advisement is merely a matter of state procedural law.

Defendant also relies on *People v. Alvas* (1990) 221 Cal.App.3d 1459 (*Alvas*).  In *Alvas*, the court decided, among other things, that a defendant against whom involuntary commitment proceedings are instituted under Welfare and Institutions Code section 6500 based upon the allegation that he or she is "mentally retarded" and a danger to him or herself or others has a due process right to a jury advisement.  (*Id.* at pp. 1463-1465.) Recently, however, the Supreme Court in *People v. Barrett* (2012) 54 Cal.4th 1081 (*Barrett*) disapproved *Alvas* on this point.  (*Id.* at pp. 1105-1106.)

Defendant also cites *Alvas* for the proposition that the failure to advise him violated the federal guarantee of equal protection.  Defendant's reliance on *Alvas* is again misplaced.

In *Alvas*, the defendant, after a bench trial, was found to be mentally retarded and a danger to himself and involuntarily committed to a state institution under Welfare and Institutions Code section 6500.  (*Alvas, supra,* 221 Cal.App.3d at p. 1462.)  The statute does not itself provide the right to a jury trial.  However, in *O'Brien v. Superior Court* (1976) 61 Cal.App.3d 62, the court held on equal protection grounds that "allegedly mentally retarded persons are entitled to a jury trial *upon request.*"  (*Id.* at p. 69, italics added.)[6]  In *Alvas*, the defendant did not request a jury trial.  Rather, he claimed the court

---

[6] The holding in *O'Brien* was compelled by the logic of *In re Gary W.* (1971) 5 Cal.3d 296, which involved a court trial on a petition to extend a juvenile's period of confinement due to his current dangerousness.  The issue in *Gary W.* was whether he had a right to a jury trial.  Examining the various statutory provisions governing involuntary commitments, the court found that only Youth Authority wards and the mentally retarded were subject to involuntary commitment for extended periods without benefit of jury trial.  The court held that where proceedings result in substantial loss of personal liberty, the state acts unconstitutionally, in violation of equal protection, if it grants jury trial to

12

erred in failing to advise him and obtain a waiver of his right to a jury trial. The court agreed.

Although the statute does not require a judicial advisement, the *Alvas* court opined that mentally retarded persons facing a commitment were similarly situated to those facing commitment under the new Lanterman-Petris-Short Act (LPS Act). Thus, since the LPS Act requires a judicial advisement, mentally retarded defendants were entitled to the same procedural safeguard. (*Alvas, supra,* 221 Cal.App.3d at pp. 1463-1465.)

The logic of *Alvas* has no application here because section 2972, like the LPS Act, expressly requires an advisement. We do not see how the failure to give a statutorily required advisement somehow qualifies as a violation of equal protection. More importantly, the Supreme Court in *Barrett*, *supra*, 54 Cal.4th 1081 disapproved *Alvas* on this point as well. (*Barrett, supra,* 54 Cal.4th at pp. 1106-1111.)

## VI. COUNSEL'S WAIVER AND THE BENCH TRIAL

As noted, defendant claims the court erred in accepting counsel's waiver and conducting a bench trial. He argues that a competent MDO has the right to decide whether to waive a jury, and therefore, the statute requires an MDO's personal waiver. The Attorney General claims that a personal waiver is not required because counsel controls the jury decision and can waive a jury even over an MDO's objection.

It is settled that the erroneous denial of a *statutory* right to a jury trial is subject to harmless-error review under the *Watson* test. (*People v. Epps* (2001) 25 Cal.4th 19, 29.) Our analysis and conclusion that the court's failure to advise was harmless applies with equal force to defendant's claim that the court erred in accepting counsel's waiver, failing to obtain his personal waiver, and conducting a bench trial. Given the evidence presented at trial, we do not find it reasonably probable the result would have been more favorable

some groups while denying it to others, unless the different treatment is shown to be necessary to achieve a compelling state interest. (*Id*. at pp. 305-307.)

13

to defendant had the court conducted a jury trial. (E.g., *People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1276 [denial of statutory right to MDO trial harmless].)[7]

For this reason, it is not necessary to address the parties' diametrically opposing legal claims concerning the validity of counsel's waiver and the bench trial.[8]

---

[7] Defendant suggests that it is inappropriate to apply the *Watson* test because the harm he suffered was not getting a jury trial and the *Watson* test would "eviscerate the statutory right to be advised of a jury trial." In *People v. Epps, supra,* 25 Cal.4th 19, the California Supreme Court held that the *Watson* test applied to the erroneous denial of a statutory right to a jury trial. (*Id*. at p. 29.) Accordingly, we are bound by this holding and not at liberty to adopt and apply some other test for prejudice. (*Auto Equity Sales, Inc*. *v. Superior Court* (1962) 57 Cal.2d 450, 455.)

[8] We note, however, that recently, in *People v. Blackburn* (2013) ____Cal.App.4 ____ [2013 WL 1736497, 13 Cal. Daily Op. Serv. 4027], we addressed both claims. We rejected the Attorney General's claim that the Act gave counsel exclusive control over whether to have a bench or jury trial. We agreed that the Act permits a competent MDO to control the decision, buy we rejected the defendant's claim that the Act required a personal waiver. Rather, we held that counsel may waive a jury at the MDO's direction or with the MDO's consent; and when there is cause to doubt the MDO's competence to determine whether a bench or jury trial is in his or her best interests, counsel can make the decision even over the MDO's objection.

## VIII. DISPOSITION

The order extending defendant's MDO commitment is affirmed.

_____
RUSHING, P.J.

I CONCUR:

_____
PREMO, J.

15

ELIA, J., Concurring

I respectfully concur in the judgment on the ground that no reversible error has been shown.  (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  A trial court's judgment or order is presumed correct.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  " '. . . All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]"  (*Ibid*.)  Since the record is silent on whether appellant knew of his right to a jury trial and agreed to a court trial, we must presume for purposes of this appeal that his counsel waived a jury in accordance with his client's informed consent (see maj. opn., *ante*, p. 6).  (See *Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 564; see also *Conservatorship of John L.* (2010) 48 Cal.4th 131, 151-152 [obligations of counsel]; cf. *People v. Blackburn* (2013) ___ Cal.App. 4th ___ [2013 WL 1736497,17-18] (conc. opn. of Elia, J.).)

_____
ELIA, J.