Filed 8/23/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | B308627 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. ZM050339-01) |
| v. | |
| JOSE NOLASCO, | **ORDER MODIFYING OPINION AND DENYING REHEARING** |
| Defendant and Appellant. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on July 29, 2021, be
modified as follows:

1.  On page 16, at the beginning of the fourth full paragraph, after "More recently, *McKee*," add the words "seems to have."  The sentence should now read:

    More recently, *McKee* seems to have applied what purported to be a form of "heightened scrutiny" that appears to be less rigorous than strict scrutiny, but more onerous than rational basis scrutiny.  (*McKee*, *supra*, 47 Cal.4th at pp. 1206-1207, 1210, 1211 & fns. 13 & 14.)

2.  On page 17, at the end of the same paragraph mentioned above, add the following sentence:

    Although *McKee* ultimately ordered a remand for the trial court to "apply[] the equal protection principles articulated in [*In re*] *Moye* [(2009) 22 Cal.3d 457] and related cases discussed in the present opinion" (*id*. at p. 1209), and *Moye* applied strict scrutiny (*In re Moye*, *supra*, 22 Cal.3d at p. 465), *Moye*'s application of that standard rested on a concession (*ibid*.), and *McKee*'s discussion of related cases, as noted above, was not clear as to *which* level of scrutiny to apply.

                    *       *       *

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

LUI, P. J.              CHAVEZ, J.              HOFFSTADT, J.

Filed 7/29/21 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>JOSE NOLASCO,<br><br>　　Defendant and Appellant. | B308627<br><br>(Los Angeles County<br>Super. Ct. No. ZM050339-<br>01) |


APPEAL from an order of the Superior Court of Los Angeles County, James N. Bianco, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Assistant Attorney General, Jaime L. Fuster and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

As pertinent here, California has two statutory mechanisms for detaining, evaluating, and treating persons who have been declared incompetent to stand trial for a felony that entailed a threat of bodily harm, and who continue to pose a danger to others. What prompts the use of one mechanism over another is the *reason* why the person is dangerous: When the reason is a "developmental disability," the applicable mechanism is civil commitment under Welfare and Institutions Code section 6500;[1] when the reason is a "mental disease, defect, or disorder," the applicable mechanism is a so-called Murphy conservatorship under the Lanterman-Petris-Short Act (LPS Act) (§ 5000 et seq.), § 5008, subdivision (h)(1)(B).[2] Each type of commitment may be renewed annually, but the end date for the one-year recommitment period under each mechanism differs: Under section 6500, the one-year period ends on the anniversary of the date of the recommitment order (§ 6500, subd. (b)(1)); for a Murphy conservatorship, the one-year period ends on the anniversary of the date of the *initial* commitment order (§ 5361). Because, as is common, recommitment orders under section 6500 are not fully litigated (and hence not issued) until *after* the anniversary of the date of the initial commitment order, the end dates for section 6500 recommitments typically get pushed out

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     The name "Murphy conservatorship" comes from the legislator who sponsored the statutory amendment creating them. (*People v. Quiroz* (2016) 244 Cal.App.4th 1371, 1376.)

further and further with each recommitment.  Does this "creep" of the end date under section 6500 violate equal protection vis-à-vis Murphy conservatorships?  We conclude that it does not, and accordingly affirm the end date for the section 6500 recommitment in this case.

FACTS AND PROCEDURAL BACKGROUND

## I.     Facts

Since his teen years, Jose Nolasco (Nolasco) has had a mild "developmental disability."  In his early 20s, Nolasco developed a mental illness as well—namely, a "major depressive disorder" with "psychotic features" that includes hearing and seeing hallucinations.

On May 5, 2017, Nolasco whipped a belt at police officers who had arrived on scene to detain him for a possible mental health hold and then tried to get away by running into oncoming traffic.  The People charged Nolasco with resisting an executive officer as a felony (Pen. Code, § 69).

The criminal charges were suspended once the trial court referred Nolasco to mental health court to evaluate his competency to stand trial.  The mental health court found him incompetent to stand trial.

After two years, Nolsaco had not regained his competency to stand trial, and the criminal court's jurisdiction was terminated.

## II.    Procedural Background

### A.     *Initial commitment under section 6500*

On June 6, 2019, the People petitioned the mental health court to commit Nolasco under section 6500 on the ground that he was a "developmentally disabled person who is dangerous to [him]self or others."

3

In support of its petition, the People produced expert testimony regarding Nolasco's mental illness and his developmental disability, along with expert opinion that his developmental disability exacerbated his mental illness by depriving him of "the coping skills" necessary to manage his mental illness. The People also introduced evidence of Nolasco's juvenile adjudications for assault with a deadly weapon and battery as well as his prior arrests for animal cruelty and domestic battery.

Following an evidentiary hearing on August 20, 2019, the mental health court found Nolasco to be an "intellectually or developmentally disabled person who is a danger to [him]self and/or others," found that his disability was a "substantial factor in causing serious difficulty in controlling [his] dangerous behavior," and found that there was "no alternative to judicial commitment." The court then committed defendant to the custody of the State for one year.

**B.** *Recommitment proceedings*

On August 14, 2020, the People petitioned the mental health court to recommit Nolasco for an additional year.

At an evidentiary hearing on October 13, 2020, the People produced expert testimony that the "psychiatric regime" Nolasco received while committed had resulted in "significant improvement" of his mental illness, but that his developmental disability still rendered him "[un]able to cope with some of his psychotic symptoms" and meant he still posed a danger to himself or others. Specifically, Nolasco had struck a fellow conservatee in July 2020 because Nolsaco got upset when the conservatee asked Nolasco to come over to him, and Nolasco would pick his nose and skin until he bled.

4

At the end of the hearing, the mental health court found that Nolasco continued to pose a danger to others and ordered him recommitted to the "least restrictive placement" for one year starting on October 13, 2020, and ending on October 13, 2021.

### C. *Appeal*

Nolasco filed this timely appeal.

## DISCUSSION

Nolasco argues that the mental health court's recommitment order under section 6500 violates equal protection because it ends on the one-year anniversary of the date of the recommitment order (October 13). Had he been recommitted in a Murphy conservatorship, Nolasco continues, the end date for his recommitment would have been nearly two months earlier on the anniversary of the date of his initial commitment (August 20). Because section 6500 commitments and Murphy conservatorships both apply to persons who are found incompetent to stand trial and who pose a danger to others, Nolasco concludes, the differential treatment in the end dates for recommitment orders violates equal protection. We independently examine whether statutory classifications offend equal protection, particularly where, as here, they rest on undisputed facts. (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208; *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912.) As the People point out, Nolasco's challenge is forfeited because he did not object on equal protection grounds before the mental health court.[3]

---

[3] We reject Nolasco's assertion that he did not forfeit his challenge because, in his view, presenting the challenge to the mental health court "would [not] have change[d] . . . the result." Nothing in the record supports Nolasco's casual aspersion that

Nevertheless, we exercise our discretion to address Nolasco's challenge because it presents an important question of public concern.  (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7; *People v. Superior Court* (1988) 200 Cal.App.3d 491, 497 (*Clements*).)  In doing so, any claim that his counsel's forfeiture of the issue constitutes ineffective assistance is obviated.

## I.      Pertinent Law on Involuntary Commitment

California has several mechanisms for the involuntary commitment of individuals deemed to present a danger to themselves or others.  Several of these mechanisms apply to individuals who suffer from mental illness and who have been previously convicted of crimes, such as individuals who qualify as mentally disordered offenders (Pen. Code, § 2960 et seq.), individuals who meet the definition of a sexually violent predator (Welf. & Inst. Code, § 6600 et seq.), and individuals found not guilty by reason of insanity (Pen. Code, § 1026 et seq.).  The two mechanisms at issue here—section 6500 commitments and Murphy conservatorships—differ from these others because they apply to individuals who have been found incompetent to stand trial for assaultive felonies but have yet to be convicted of them.  The specific contours of these preconviction mechanisms are discussed next.

### A.      *Section 6500 commitments*

An individual may be civilly committed under section 6500 only if the People prove that (1) he has a "developmental disability" (§ 6500, subd. (b)(1)), (2) he poses a "danger to [him]self or others," which can be established by a prior "finding of incompetence to stand trial" during a prosecution for several

---

the mental health court would have failed to consider his challenge on its merits.

6

felonies, including any "felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person" (*id.*, subds. (a)(1) & (b)(1)), and (3) his developmental disability played a "substantial factor" in "causing him . . . serious difficulty in controlling his . . . dangerous behavior" (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 105-106).

For this purpose, a developmental disability is a "disability that originates before an individual attains 18 years of age, continues, or can be expected to continue indefinitely, and constitutes a substantial disability for that individual." (§§ 6500, subd. (a)(2), 4512, subd. (a).) It includes intellectual disabilities. (*Ibid.*)

When an individual is *initially* committed under section 6500, that commitment expires "automatically one year after the order of commitment is made." (§ 6500, subd. (b)(1)(A).) When that individual is *re*committed (that is, committed for a subsequent, temporally contiguous period of time), the mental health court is to "follow[]" "the same" "procedures" as for an "initial petition for commitment" (*id.*, § 6500, subd. (c)(1)), which means the *re*commitment expires on the one-year anniversary of the date of the *order of recommitment.*

### B. *Murphy conservatorships*

Murphy conservatorships are just one of the many types of civil commitments authorized by the LPS Act for persons who are "dangerous or gravely disabled" by virtue of mental illness.[4] (§

---

[4] The other types reach persons who are (1) "gravely disabled" because they are "unable to provide for [their] basic personal needs for food, clothing, or shelter" due to "a mental health disorder" (§ 5008, subd. (h)(1)(A)), or due to "impairment by chronic alcoholism" (*id.*, subd. (h)(2)), or (2) "imminently

7

5008, subd. (h); *Conservatorship of John L.* (2010) 48 Cal.4th 131, 142 ["The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled."].)

An individual may be placed in a Murphy conservatorship only if the People prove that (1) he suffers from a "mental disease, defect, or disorder," (2) he has been "found mentally incompetent" during a prosecution for "a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person" after "[t]here has been a finding of probable cause" regarding that felony, and (3) his "mental disease, defect, or disorder" is why he "represents a substantial danger of physical harm to others." (§ 5008, subd. (h)(1)(B).)

The LPS Act does not define what it means by "mental disease, defect, or disorder," but "[c]ourts applying the LPS Act and similar commitment schemes have sought to fill this gap" by defining "mental illness and related disorders" as "conditions that may arise suddenly and, for the first time, in adulthood." (*People v. Barrett* (2012) 54 Cal.4th 1081, 1108 (*Barrett*).) The term excludes "persons with intellectual disabilities" (that is, persons who are developmentally disabled) unless these persons *also* suffer from mental illness. (§ 5008, subd. (h)(3).)

When an individual is initially committed under a Murphy conservatorship, the conservatorship "shall automatically terminate one year after" the order "appoint[ing] . . . the conservator" is made. (§ 5361.) When that individual is *re*committed (that is, committed for a subsequent, temporally contiguous period of time), the mental health court may extend

dangerous" (*id.*, § 5300; *In re Smith* (2008) 42 Cal.4th 1251, 1265 (*Smith*)).

8

the conservatorship "for a succeeding one-year period," which means the *re*commitment terminates on the anniversary of the *order of initial commitment.* (*Id.*; accord, *Conservatorship of Jose B.* (2020) 50 Cal.App.5th 963, 968-969 [applying these dates].)

## II. Analysis

### A. *Equal protection principles*

Both the federal and California Constitutions guarantee that no person shall be "den[ied] . . . the equal protection of the laws." (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) "'The right to equal protection of the law is violated when "the government . . . treat[s] a [similarly situated] group of people unequally without some justification."'" (*In re Murray* (2021) 63 Cal.App.5th 184, 190.) Equal protection analysis consequently has two steps.

The first, threshold step is to determine whether there are two groups of individuals who are "'"similarly situated with respect to the legitimate purpose of the law"'" but are being treated differently. (*Barrett, supra,* 54 Cal.4th at p. 1107, quoting *In re Gary W.* (1971) 5 Cal.3d 296, 303.) "If the two groups are not similarly situated or are not being treated differently, then there can be no equal protection violation." (*People v. Castel* (2017) 12 Cal.App.5th 1321, 1326.)

However, if the first step is satisfied, the second step is to ascertain whether the Legislature has a constitutionally sufficient justification for the differential treatment of the similarly situated groups. (*In re Marriage Cases* (2008) 43 Cal.4th 757, 831-832.) What constitutes sufficient justification varies. "If the law treats people differently on the basis of their membership in certain 'suspect class[es]' (such as their race) or if the differential treatment 'affect[s] a fundamental right,' then the

9

government must satisfy [so-called] [']strict[] scrutiny['] by demonstrating that the differential treatment . . . is necessary to serve a compelling interest." (*People v. Love* (2020) 55 Cal.App.5th 273, 287, review granted Dec. 16, 2020, S265445, quoting *People v. Chatman* (2018) 4 Cal.5th 277, 288.)[5] Otherwise, the challenger must show that the law fails so-called "rational basis" scrutiny by demonstrating that "there is no 'rational relationship between the disparity of treatment and some legitimate government purpose.'" (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) Rational basis scrutiny is "exceedingly deferential: A law will be upheld as long as a court can 'speculat[e]' any rational reason for the resulting differential treatment, regardless of whether the 'speculation has "a foundation in the record,"' regardless of whether it can be 'empirically substantiated,' and regardless of whether the Legislature ever 'articulated' that reason when enacting the law." (*Love*, at p. 287, quoting *Turnage*, at pp. 74-75.)

**B.** *Application*

Because there can be no dispute section 6500 commitments and Murphy conservatorships fix different dates for when a recommitment ends, the equal protection analysis in this case turns on two questions: (1) Are individuals civilly committed under section 6500 and Murphy conservatorships similarly situated for purposes of fixing the end date for a recommitment,

---

[5] There is also an intermediate level of scrutiny that applies the differential treatment is based on membership in other suspect classes (such as gender or illegitimacy) (*Chatman, supra*, 4 Cal.5th at p. 288), but such membership—and hence this level of scrutiny—is not at issue in this case.

10

and if so, (2) is there a sufficient justification for this differential treatment?

1. *Similarly situated?*

To be similarly situated, the groups that the Legislature treats differently need not—and, indeed, cannot—be "identical." (*People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*), superseded on other grounds by section 6608 as stated in *People v. McCloud* (2021) 63 Cal.App.5th 1, 14-15.) It is enough that the two groups have "common features" that render them similar "for [the] purposes of the law [being] challenged." (*Id.* at p. 1202.)

Because a person is eligible for commitment under *both* section 6500 and a Murphy conservatorship only if he has been charged with an assaultive felony, if he has been found incompetent to stand trial, and if he poses a danger to others by virtue of his mental deficiency, what differentiates these two mechanisms for civil commitment is the type of mental deficiency that renders the committed person dangerous: Section 6500 commitments apply to persons with developmental disabilities, while Murphy conservatorships apply to persons suffering from mental illness. (Compare § 6500 with § 5008, subd. (h)(1)(B).)[6]

---

[6] Several cases have held that individuals subject to different civil commitment mechanisms are similarly situated for the purpose of various procedural protections when the mechanisms at issue all provide for commitment of the mentally ill (rather than, as is the case here, one mechanism provides for commitment of persons with mental illness and the other for persons with developmental disabilities). These purposes include whether the period of civil commitment may be indefinite rather than have a fixed end date (e.g., *McKee*, *supra*, 47 Cal.4th at p. 1184 [sexually violent predators and mentally disordered offenders are similarly situated]), and whether the individual

11

Are developmental disabilities and mental illness different?
Yes.

As our Supreme Court has repeatedly held, "[m]ental illness and related disorders are . . . conditions that may arise suddenly and, for the first time, in adulthood." (*Barrett*, *supra*, 54 Cal.4th at p. 1108.) Many forms of mental illness are treatable, such that "need for treatment may be temporary," and the mental illness itself may be "intermittent or short lived." (*Id*.) "'[M]ental illness [also] "often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . many mentally ill persons retain the capacity to function in a competent manner.""" (*In re Qawi* (2004) 32 Cal.4th 1, 17; accord, *People v. Blackburn* (2015) 61 Cal.4th 1113, 1128 (*Blackburn*).) Developmental disabilities, by contrast and by definition, "appear

___

may refuse to testify during the commitment proceedings (e.g., *People v. Dunley* (2016) 247 Cal.App.4th 1438, 1442-1443 [mentally disordered offenders and persons found not guilty by reason of insanity are similarly situated]; *People v. Curlee* (2015) 237 Cal.App.4th 709, 721-723 [sexually violent predators, and persons found not guilty by reason of insanity are similarly situated]; *People v. Alsafar* (2017) 8 Cal.App.5th 880, 887 [mentally disordered offenders, sexually violent predators and persons found not guilty by reason of insanity are similarly situated]; *Conservatorship of J.Y.* (2020) 49 Cal.App.5th 220, 229, 231, review granted Aug. 19, 2020, S263044 [LPS Act conservatees and persons found not guilty by reason of insanity are similarly situated]; *Conservatorship v. E.B.* (2020) 45 Cal.App.5th 986, 995-996 [same], review granted June 24, 2020, S261812; but see *Conservatorship of Bryan S.* (2019) 42 Cal.App.5th 190, 197-198 [LPS Act conservatees are not similarly situated to mentally disordered offenders, sexually violent predators and persons found not guilty by reason of insanity]).

early in life," "never recede," and involve one or more deficiencies in "cognitive and intellectual functioning" that "affect [one's] ability to 'make the basic decisions'" regarding legal proceedings and other matters. (*Barrett*, at pp. 1103, 1109; *Blackburn*, at p. 1128.) (Accord, *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 487 ["The developmental disability that may result in mental incompetence is different from the mental disorder that may also have that result."].)

But do these differences between developmental disabilities and mental illness justify treating them differently when it comes to the procedures by which persons suffering from them are civilly committed? It depends.

Our Supreme Court has "assumed" that persons with mental illness and persons with developmental disabilities are similarly situated when it comes to the right to a jury determination of whether the People have proven the prerequisites for commitment. (*Barrett*, *supra*, 54 Cal.4th at p. 1108; accord, *People v. Sweeney* (2009) 175 Cal.App.4th 210, 216-221 [rejecting equal protection challenge only after concluding that both groups have a right to a jury determination of the prerequisites].) Ostensibly, this is because the differences in the type of mental ailment are irrelevant as to whether commitment should be found by a judge or a jury.

However, our Supreme Court has held that persons with mental illness and persons with developmental disabilities are *not* similarly situated when it comes to whether they are entitled to a personal advisement of the right to a jury trial and whether a personal waiver of that right is necessary. (*Barrett*, *supra*, 54 Cal.4th at pp. 1108-1109.) That is because persons with developmental disabilities—unlike persons with mental illness—

13

lack "cognitive and intellectual functioning," and because their more "reduced ability to understand, and make decisions about, the conduct of the proceedings" makes it appropriate to "limit the personal and procedural role they play" during the commitment proceedings. (*Id.* at p. 1109.)

But do the differences between developmental disabilities and mental illness justify treating them differently when it comes to the timetable for terminating a one-year period for a recommitment? In our view, yes.

By definition, mental illness is more fleeting. As noted above, it comes on in adulthood; it can be "intermittent" and "short lived"; and it is often treatable. (*Barrett*, *supra*, 54 Cal.4th at p. 1108.) Because an individual's mental illness can come and go, there is a greater danger that delay in evaluating his condition—and delay in his release arising from the time it takes to litigate recommitment—could result in the unnecessary commitment of a person who no longer suffers from a mental illness that poses a danger. Put differently, with mental illness, it makes sense to fix a termination date for recommitment sooner rather than later. By contrast, developmental disabilities are not fleeting. By definition, they come on during childhood or adolescence and they "never recede." (*Barrett*, at pp. 1103, 1109.) Chances are scant that a person will "recover" from a developmental disability and hence there is less danger of their unnecessarily prolonged commitment. Put differently, with developmental disabilities, time is far less of the essence and there is less need to fix a termination date for recommitment sooner rather than later.

Nolasco's sole response is to assert that he is both mentally ill and developmentally disabled and that "almost everyone" has

14

a similar dual diagnosis, such that the different end dates for period of recommitment under section 6500 and a Murphy conservatorship empower the People to arbitrarily elect which mechanism to use. This response lacks merit both factually and legally. Factually, Nolasco offers no evidence to support his broad generalization that "almost everyone" who suffers from mental illness also suffers from a developmental disability and vice versa; the existence of two different mechanisms to address civil commitment for each tends to refute the notion that a Venn diagram of the populations of the mentally ill and the developmentally disabled would be mostly overlapping and shaded. Furthermore, if Nolasco is indeed a member of both classes, persons who suffer from a dual diagnosis are likely to be more dangerous than persons who suffer from mental illness alone because, as the expert in this case testified, persons who also have developmental disabilities lack "the coping skills necessary to manage [their] mental illness." Thus, persons with such a dual diagnosis will likely need more time to address their mental illness than those who suffer from mental illness alone, which justifies a less strict end date for recommitment. Legally, the gist of Nolasco's argument—namely, that there is an equal protection violation merely because the government is allowed to choose between two statutes when it prosecutes and thereby commits a person to the State's custody—has been rejected by both the United States Supreme Court and our Supreme Court. (*United States v. Batchelder* (1979) 442 U.S. 114, 124-125; *People v. Wilkinson* (2004) 33 Cal.4th 821, 838.)

2. *Sufficient justification?*

Even if we assume that persons civilly committed under section 6500 and in a Murphy conservatorship are similarly

15

situated for purposes of the timetable for terminating a one-year period for a recommitment, we must next ask whether there is a sufficient justification for that differential treatment.

a.        What level of justification is needed?

Because our Legislature "may adopt more than one procedure for isolating, treating, and restraining dangerous persons" and the "differences will be upheld if justified" (*McKee*, *supra*, 47 Cal.4th at p. 1209; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171-172 (*Hoffeber*)), it is critical to know the degree of justification needed to uphold the different procedures.

Unfortunately, the law in this area appears to be in a state of flux.

Traditionally, the California courts have applied strict scrutiny to "claims of disparate treatment in civil commitment." (*Smith*, *supra*, 42 Cal.4th at p. 1263; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20; *Hofferber*, *supra*, 28 Cal.3d at p. 171, fn. 8; *In re Moye* (1978) 22 Cal.3d 457, 465, superseded on other grounds by Penal Code section 1026.5 as stated in *People v. Superior Court* (*Frezier*) (2020) 54 Cal.App.5th 652, 663.) Under this line of precedent, strict scrutiny is deemed appropriate because the committed person's "fundamental liberty interest is at stake." (*Hofferber*, at p. 171, fn. 8; *Smith*, at p. 1263.)

More recently, *McKee* applied what purported to be a form of "heightened scrutiny" that appears to be less rigorous than strict scrutiny but more onerous than rational basis scrutiny. (*McKee*, *supra*, 47 Cal.4th at pp. 1206-1207, 1210-1211 & fns. 13 & 14.)  *McKee* explained that it was not applying the "usual judicial deference to legislative findings" consonant with rational basis scrutiny (*id.* at p. 1206), while simultaneously insisting that

it was also not applying strict scrutiny (*id.* at p. 1210, fn. 13). Instead, *McKee* appears to have applied something in between by "exercis[ing its own] independent judgment of the facts to ascertain whether the legislative body "'has drawn reasonable inferences based on substantial evidence.'" [Citation.]" (*Id.* at p. 1206.)

Most recently, *Barrett* applied rational basis scrutiny when evaluating whether equal protection required persons in commitment proceedings under section 6500 and Murphy conservatorships both to be personally informed and to personally waive the right to a jury trial. (*Barrett, supra,* 54 Cal.4th at p. 1111, fn. 21.)

Because the more recent decisions in *McKee* and *Barrett* do not expressly overrule—or, for that matter, address—the older cases applying strict scrutiny, the coexistence of the three lines of cases has created confusion in the Court of Appeal. (Compare *Dunley, supra,* 247 Cal.App.4th at pp. 1451-1452 [citing cases following traditional rule and applying strict scrutiny]; *People v. Field* (2016) 1 Cal.App.5th 174, 195-196 [same]; *Conservatorship of J.Y., supra,* 49 Cal.App.5th at p. 232 [same] with *People v. Rosalinda C.* (2014) 224 Cal.App.4th 1, 13-14 [citing *Barrett* and applying rational basis scrutiny]; *Landau v. Superior Court* (2019) 32 Cal.App.5th 1072, 1085 [applying rational basis scrutiny].)

Here, we choose to follow *Barrett*—and hence to apply rational basis scrutiny—because *Barrett* is the most recent pronouncement by our Supreme Court as to the pertinent level of scrutiny to apply when comparing divergent civil commitment procedures. (See *Samara v. Matar* (2018) 5 Cal.5th 322, 332 [following "[t]he weight of more recent authority"].) Furthermore,

17

*Barrett* is the authority most on point to this case. (Compare *Barrett*, *supra*, 54 Cal.4th at 1106-1107 [analyzing section 6500 compared with LPS Act] with *McKee*, *supra*, 47 Cal.4th at 1196-1198 [analyzing Sexually Violent Predator Act compared with Mentally Disordered Sex Offender Act, not guilty by reason of insanity committees, and LPS Act].)

> b.      Has that justification been met?

The differential treatment between the end date for the period of recommitment under section 6500 and under a Murphy conservatorship withstands rational basis scrutiny. As explained above, time is more of the essence for persons who suffer from mental illness alone given the transitory nature of such illness; thus, our Legislature with regard to Murphy conservatorships rationally tied the end date for recommitment to the anniversary of the initial date of commitment for persons suffering from mental illness alone, but did not do so for persons suffering from developmental disabilities under section 6500. The Legislature's recognition of the difference between these two populations is legitimate and is rationally related to its selection of different end dates for periods of recommitment. (*Turnage*, *supra*, 55 Cal.4th at p. 74.)

Nolasco's chief response is to urge that *Barrett* is wrongly decided and to implore us to follow the traditional rule applying strict scrutiny. Of course, it is not our place to overrule *Barrett* (*Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450, 456), and we have elected to follow *Barrett* because of its recency and subject matter relevancy.

18

**DISPOSITION**

The order is affirmed.

**<u>CERTIFIED FOR PUBLICATION</u>.**


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ